**Russell L. STEVENS, Plaintiff,**

v.

**Duane STUBBS, Commanding General, Army and Air Force Exchange Service, Defendant.**

**Civ. A. No. C81–1693A.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 22, 1983.

William D. Mallard, Jr., Mallard, McDonald & Horder, Atlanta, Ga., for plaintiff.

Myles E. Eastwood, Asst. U.S. Atty., Atlanta, Ga., for defendant.

## ORDER

FORRESTER, District Judge.

This action is before the court now on defendant's motion for summary judgment on both counts of plaintiff's complaint. Count I of plaintiff's complaint asserts that plaintiff was downgraded from his position as vehicle operations manager, UA–10, to warehouseman, HPP5, because of plaintiff's physical handicap and in retaliation against plaintiff for assisting a female employee in the exercise of her equal employment opportunity rights. Count II asserts that plaintiff's downgrading was based on, in addition to factors cognizable under Title VII (the physical handicap and retaliation for assisting a female employee in a sex discrimination case), a personal bias against plaintiff on the part of his supervisor and was therefore arbitrary and capricious and violated his due process rights. Plaintiff seeks reinstatement with full back pay and benefits, declaratory relief, costs, attorney's fees and expenses.

### I. FACTS.

Plaintiff Russell Stevens was employed by the Army and Air Force Exchange Service (AAFES) for approximately fourteen years. From 1978 to 1981 he was assigned to the AAFES Eastern Distribution Region (EDR) as a UA–10 vehicle manager. During 1979 and 1980 plaintiff experienced health problems which required repeated absences from work. AAFES records reflect that beginning August 6, 1979, after frequent usage of sick leave by plaintiff, AAFES management began making efforts to determine plaintiff's fitness for duty. On August 16, 1979 plaintiff was authorized advance sick leave not to exceed 240 hours in connection with testing and treatment of his undetermined illness. On September 6, 1979 exploratory surgery was

performed and his ailment was diagnosed. The attending physician opined that plaintiff's complete recovery would take six to eight weeks. By letter of November 1, 1979 the chief of EDR, Hanon Knight, requested that the Personnel Office assign plaintiff to the AAFES Management Reserve Force (MRF) and subsequently transfer him to another location. Mr. Knight's request stated that "irrespective of Mr. Stevens' physical condition, he has not demonstrated the capacity or capability to deal with everyday pressures and complex routines of this large operational and sensitive assignment." By letter of November 7, 1979 plaintiff himself requested a transfer to a less demanding job because his current assignment had "created tremendous demands on [his] energy and may have affected [his] health." On November 28, 1979 Mr. Knight requested that plaintiff's physician review plaintiff's job description and render an opinion as to plaintiff's ability to perform the duties of vehicle manager. Plaintiff's physician, Dr. Hardcastle, responded by letter of December 3, 1979 that he saw no reason why plaintiff could not perform the duties of a vehicle manager and that he had no reason to think that plaintiff would have any permanent disability." On December 10, 1979 plaintiff was informed that

> There are no current or projected suitable vacancies in the worldwide AAFES for which you can be considered. Your request for transfer will be made a matter of record in your career management folder. In an effort to broaden the range of possible positions to which you could be transferred, a request for voluntary downgrade transfer to a less demanding position either within your current career field or another would be required.
> 4. Since you are technically qualified as a vehicle manager (operations), UA-10, you will be continued in that assignment. In the event your job performance is less than adequate, appropriate action may be taken pursuant to Section III, Chapter 3, AR60-21-AFR147-15, Exchange Service Personnel Policies, 1 August 1979.

On May 30, 1980 plaintiff's supervisor, George Driskell, noted in a memorandum that despite the fact that plaintiff had been certified as fit for duty by his physician, he had used 67.5 hours of leave between March 31 and May 30 and expressed the opinion that "Mr. Stevens mentally cannot cope with the day-to-day requirements of his present position."

On his 1979–1980 Performance Evaluation Report (PER) plaintiff received a score of 56 out of a possible 100 and an overall rating of "unsatisfactory." On July 7, 1980 a warning letter was issued to plaintiff which set out specific deficiencies in his performance of his responsibilities and suggested ways of improving. The letter notified plaintiff that:

> Upon receipt of this letter you will be placed on a warning period for 60 calendar days to afford you the opportunity to improve your performance. At the end of the warning period, a performance evaluation review will be completed. If it is determined that your performance is satisfactory, you will be continued in your present position; if it is determined that your performance is unsatisfactory, you may be given a lateral or downgrade transfer or separated for unsatisfactory performance.
> 7. You have the right within five workdays of receipt of this letter to submit a reply orally, in writing, or both to the supervisor. You may be accompanied by a representative during the oral reply if requested.

.     .     .     .     .

The warning letter was withdrawn two weeks later when plaintiff again took extensive sick leave.

On August 25, 1980 the Chief of the EDR again requested that the personnel office place plaintiff in the Management Reserve Force so that someone else could perform his functions. The Director of Personnel rejected the request on September 19, 1980 but approved a request for dual incumbency which would insure that plaintiff's position would be filled during his extended leave. Shortly thereafter

plaintiff's doctor certified that he was again able to return to full-time work "performing his usual duties without aggrevating [sic] his physical problems." After plaintiff was so certified, the warning letter was reissued and a new 60-day warning period began.

After approximately 30 days plaintiff's first and second line supervisors, James R. McLemore and Robert L. Paterick, counseled plaintiff on his performance during the first 30 days. Each gave him specific suggestions on how to improve his performance which each told him was still regarded as unsatisfactory.

On December 19, 1980 Mr. McLemore prepared the Personnel Evaluation Report (PER) for October 16, 1980–December 16, 1980. McLemore rated plaintiff's performance as "unsatisfactory" with a numerical score of 26 out of 100 points. Robert L. Paterick and Charles H. Wiesneth, plaintiff's second and third line supervisors, each concurred with McLemore's rating. Each of the three supervisors based his conclusion on plaintiff's unsatisfactory performance during the 60-day period. On January 16, 1981 plaintiff was issued an Advance Notice of Downgrade or Unsatisfactory Performance. The notice stated that the reason for the proposed downgrading was that plaintiff's performance during the warning period had been unsatisfactory and listed specific reasons for that evaluation. Plaintiff responded to the advance notice on January 30, 1981. However, the Final Decision to Downgrade for Unsatisfactory Performance was issued on February 11, 1981. This document states that plaintiff's reply to the advance notice had been given full consideration before the final decision was made and responds to each of plaintiff's arguments.

On February 26, 1981 plaintiff appealed his downgrade to the Commander of AAFES arguing that the "entire process has been planned and carried out as retaliation against me for two incidents in which I have incurred the wrath of transportation branch chief Charles H. Wiesneth." Plaintiff argued that the final decision to downgrade him was merely "the pro forma and predetermined last step in a proceeding which was decided long before." Plaintiff argued that his downgrading was due to a combination of impermissible factors: Discrimination based upon his physical handicap; retaliation for his part in aiding a female employee in her Title VII claim; and retaliation by his superior because he had successfully appealed an earlier PER.

Plaintiff's handicap discrimination and his claim of retaliation for aiding a woman in her Title VII claim were investigated by an Equal Employment Opportunity investigator, and an administrative decision unfavorable to plaintiff was issued on August 14, 1981. Plaintiff's other claim that the entire review process was poisoned by the vendetta against him by his superior, Charles Wiesneth, was eventually heard before hearing examiner Melvin R. Cohen. Plaintiff was represented by counsel, allowed to introduce evidence, examine and cross-examine witnesses, and testify in his own behalf. The hearing examiner expressly considered plaintiff's claims that the supervisors had merely engaged in a pro forma exercise to get rid of him and concluded that the claims were unsupported by credible evidence. The hearing examiner concluded that there was substantial evidence in the record to support the agency decision to downgrade plaintiff and that the decision was not arbitrary or capricious.

## II. COUNT II: THE NON–EEO CLAIM.

Plaintiff's non-EEO claim asserts in essence that plaintiff was downgraded arbitrarily and capriciously based on factors unrelated to his job performance, that the entire process by which his job performance was evaluated and the decision to downgrade him was reached was tainted by the prejudice of his superiors, and that the downgrading therefore deprived him of his property interest in his employment without due process of law. Plaintiff seeks review of the action against him under the Administrative Procedure Act, 5 U.S.C. § 702. Under this Act, judicial review of agency action is limited to a determination

of whether substantial evidence exists in the record to support the agency action or whether the action taken was arbitrary and capricious. *See Young v. United States,* 498 F.2d 1211 (5th Cir.1974). A *de novo* evidentiary hearing is not permitted. *Polcover v. Secretary of Treasury,* 477 F.2d 1223 (D.C.Cir.1973). Also, the court is not to weigh the evidence and substitute its judgment for that of the administrative agency. Rather, the court is merely to consider the evidence on both sides to determine whether the evidence supporting the agency's decision can fairly be said to be substantial in the face of opposing evidence. *Willapoint Oysters v. Ewing,* 174 F.2d 676 (9th Cir.), *cert. denied,* 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949). Thus, even if two inconsistent conclusions can be drawn from the evidence, the agency is to be affirmed if its conclusion is supported by substantial evidence. *Deutsch v. Atomic Energy Comm.,* 401 F.2d 404 (D.C.Cir.1968).

The court has reviewed all the evidence submitted to the Administrative Hearing Officer and concludes that the evidence offered by defendant to support its position that plaintiff's downgrade was justified was substantial. Plaintiff offered evidence to show that the action against him was biased and fully argued his position before the hearing officer. The hearing officer, who was able to observe the demeanor of plaintiff's witnesses, found that they did not credibly support plaintiff's contentions. The court cannot, looking at the cold record before it, conclude that the finding of the hearing officer on this point was clearly erroneous. Since substantial evidence exists in the record to justify the agency's action, the court affirms the finding of the hearing officer that plaintiff's downgrade was not due to the bias or vindictiveness of his superiors.

Plaintiff in his brief and in his arguments below pointed to several failures of the agency to comply strictly with its own internal regulations prior to the time plaintiff received his Advance Notice of Downgrade. The court finds that these violations were minor and did not deprive plaintiff of due process. Given the administrative hearing officer's conclusion that bias against plaintiff was not a factor in the decision-making process, the court cannot say that plaintiff was deprived of the essentials of due process—fair notice of the complaints against him and a meaningful opportunity to defend himself. As to Count II of plaintiff's complaint, defendant's motion for summary judgment is GRANTED.

### III. COUNT I: THE EEO CLAIMS.

#### A. Handicap Discrimination.

Count I of plaintiff's complaint asserts that defendant downgraded him in part because he was handicapped in violation of 29 U.S.C. § 791. A civil right of action for complaints brought under § 791 is provided for in 29 U.S.C. § 794a. As an initial matter it should be observed there is some question about whether or not plaintiff is truly handicapped within the meaning of the Rehabilitation Act of 1973 as amended and codified at 29 U.S.C. § 701 *et seq.* Plaintiff does not suffer from the loss of a limb or his sight or some other commonly recognized handicap. Indeed, the nature of his "handicap" is somewhat uncertain. It appears from the record that he missed extended periods of work during 1979 and 1980 due to illness, the exact nature of which is unclear. During this illness his superiors reached the conclusion that plaintiff's performance of his job functions was deteriorating to the point that his department was out of control. The Personnel Evaluation Report (PER) which triggered the warning letter was based upon plaintiff's work during this time of frequent absences due to illness. However, there is evidence in the record that plaintiff's superiors did not believe that plaintiff's absences were solely due to his health but were rather in part due to his inability to cope with the stress of his job. In any event, the warning period upon which plaintiff's final PER and the downgrading were based did not begin until after plaintiff's physician had certified him as fully able to return to work and handle all the responsibilities of his job. Thus, not only is there a

question about whether plaintiff was handicapped, but there is also a question of causation. If indeed plaintiff was handicapped at some point, would a decision to downgrade based upon performance during a period after plaintiff's physician had certified him as healthy be considered handicap discrimination?

Although the Rehabilitation Act does not define the term "handicapped," the EEOC regulations promulgated under the Act provide guidance. 29 CFR § 1613.702 provides:

(a) "Handicapped Person" is defined for this subpart as one who: (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment.

(b) "Physical or Mental Impairment" means (1) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine; or (2) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(c) "Major Life Activities" means functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(d) "Has a record of such an impairment" means has a history of, or has been classified (or misclassified) as having a mental or physical impairment that substantially limits one or more major life activities.

(e) "Is regarded as having such an impairment" means (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; ... (3) or has none of the impairments described in (b) of this section but is treated by an employer as having such an impairment.

(f) "Qualified handicapped person" means with respect to employment a handicapped person who, with or without reasonable accommodation can perform the essential functions of the position in question without endangering the health and safety of the individual or others
. . . .

■ Giving all reasonable inferences to the plaintiff, the court concludes that plaintiff has failed to establish that he is a "handicapped person" as defined by 29 CFR § 1613.702. Plaintiff has offered no evidence to show that he has now or has ever had a physical or mental impairment which substantially limits one or more of his major life activities. At best the record shows only that plaintiff may have suffered from an undisclosed transitory illness which may have required him to take periods of sick leave. During the period he was evaluated, however, he had been certified by his doctor as fit for duty. Whatever the precise delineations of the term "impairment," the court is unconvinced that it encompasses transitory illnesses which have no permanent effect on the person's health. *See Doss v. General Motors Corp.,* 25 FEP Cases 419 (C.D.Ill.1980); *Advocates v. Sears, Roebuck & Co.,* 67 Ill. App.3d 512, 21 FEP Cases 506 (1978).

Plaintiff concedes in his brief that he was not suffering from an "impairment" during the warning period. Instead, plaintiff argues that he was regarded by his employer as having such an impairment and that he is, therefore, a handicapped person under § 1613.702(a)(3). However, the record does not support plaintiff's contention. At best the record reflects only that plaintiff's superiors were concerned about plaintiff's excessive use of sick leave and his inability to perform his job functions. Nowhere in the record is there evidence that plaintiff's supervisors regarded plaintiff as having an impairment as that term is defined in the regulations. In fact, the record expressly reflects his supervisors' concern that plaintiff was taking excessive sick leave for reasons *unrelated* to his health. Further, the facts show that

during the warning period which served as the basis for the downgrade plaintiff's employers expressly perceived him as *physically* fit to perform his job and on that basis reissued the warning letter.

■ The handicap discrimination laws protect only "qualified handicapped persons," i.e., those who *can* do their job *"in spite of"* their handicaps, rather than those who *could* do the job *but for* their handicap. *See Cook v. United States Department of Labor,* 688 F.2d 669, 670–71 (9th Cir.1982); *Prewitt v. United States Postal Service,* 662 F.2d 292, 307 (5th Cir. Unit A 1982). The law does not protect absenteeism or employees who take excessive leave and are unable to perform the prerequisites of their jobs. Since plaintiff is unable to establish that he is handicapped within the meaning of the law, he is unable to show that he is a "qualified handicapped person" entitled to protection. Defendant is therefore entitled to summary judgment on plaintiff's claim of handicap discrimination.

**B. The Retaliation Claim.**

■ In this part of his complaint plaintiff alleges that one of his supervisors, Mr. Wiesneth was vindictive towards him because plaintiff had helped a female employee become qualified for a position which Mr. Wiesneth allegedly did not feel should be occupied by a woman. Plaintiff alleges that he "further antagonized Mr. Wiesneth by giving a supportive affidavit in connection with Ms. Kurtz's subsequent EEO complaint." Plaintiff asserts that Mr. Wiesneth retaliated against plaintiff for assisting the woman by getting personally involved in the decision to downgrade plaintiff. Retaliation is proscribed by 42 U.S.C. § 2000e–3(a), which provides:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, *assisted,* or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

The cases seem *to* suggest that for a plaintiff to prevail on a retaliation claim he must prove that his dismissal (or downgrading) was based solely, or at least predominantly, upon a retaliatory motive. Where strong independent legitimate justifications for the dismissal exist, the courts have held that plaintiff has failed to prove retaliation. *See Mills v. National Distillers Products Co.,* 17 Fep. Cases 73 (S.D.Ohio 1978); *Johnson v. Lybecker,* 15 Fep. Cases 300 (1977). Whether the dismissal was due to permissible or impermissible factors is a question of fact.

■ In this case plaintiff has offered testimony of fellow employees which would support his claim that Mr. Wiesneth had a vindictive attitude towards him. Because of Mr. Wiesneth's role in the decision to downgrade plaintiff, it cannot be said as a matter of law that plaintiff's dismissal was not a result of a retaliatory motive. That will be a question for the court to decide after considering the independent justifications offered by the employer. Therefore, defendant's motion for summary judgment as to plaintiff's claim that his downgrading was in part a result of a retaliatory motive on the part of Mr. Wiesneth is denied.

**IV. CONCLUSION.**

In sum, defendant's motion for summary judgment is GRANTED as to the non-EEO claims contained in Count II of plaintiff's complaint and the handicap discrimination claim in Count I. It is DENIED as to the retaliation claims contained in Count I.