Lisa M. **LARKINS**

v.

**CIBA VISION CORPORATION**, Astra
**Lloyd, Francine Childers, Connie Wil-
banks, Aly Cannon and Gene Straub.**

**Civ. No. 1:93–CV–936–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 6, 1994.

Loretta Jean Mirandola, Office of Loretta
Jean Mirandola, Lawrenceville, GA, for plain-
tiff.

Weyman Thompson Johnson, Jr., Kelly Jean Koelker, Laura Lynne Pulliam, Paul Hastings Janofsky & Walker, Atlanta, GA, for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This case is before the court on the following motions: (1) Defendant CIBA Vision Corporation's motion for summary judgment; (2) Plaintiff Lisa M. Larkins' motion for late filing of her response to Defendant's motion for summary judgment; (3) Defendant's motion for leave to file a supplemental brief in support of its motion for summary judgment; and (4) Defendant's motion for leave to file a second supplemental brief in support of its motion for summary judgment.

Plaintiff's complaint alleges that Defendants intentionally discriminated against her in violation of the Americans with Disabilities Act of 1990 ("ADA"). Plaintiff further alleged that Defendants Astra Lloyd, Francine Childers, Connie Wilbanks, Aly Cannon, and Gene Straub were liable for intentional infliction of emotional distress under Georgia state tort law. By order dated September 15, 1993, this court granted a motion to dismiss all claims against the individual Defendants. Accordingly, the only remaining claim in this case is Plaintiff's ADA claim against Defendant CIBA Vision Corporation (hereafter referred to as "Defendant").

## FACTS

After occasionally working for Defendant on a temporary basis, Plaintiff Lisa Larkins was hired by Defendant on March 19, 1990, as a secretary/receptionist in the Lens Care Distribution Department. On May 13, 1991, Plaintiff's secretarial position was eliminated. Defendant, however, continued Plaintiff's employment by transferring her to the position of Customer Service Representative ("CSR").

Plaintiff does not complain about her transfer to the CSR position in this lawsuit. In fact, Plaintiff was "happy" to remain employed with Defendant, and she initially enjoyed working with customers as a CSR. (Larkins depo., p. 87).

As a CSR, Plaintiff was responsible for answering telephone calls from customers who wished to place orders or lodge complaints. Plaintiff understood that talking on the telephone "was a major part" of the CSR position. (Larkins depo., p. 97). In her affidavit filed with the Equal Employment Opportunity Commission ("EEOC"), Plaintiff stated that "I have all the qualifications necessary to perform the job duties of a Customer Service Representative, which included answering approximately 150–300 calls per day, with a 95% Work Standard." (*Id.* at Exhibit 10).

In addition to answering telephone calls, some CSRs were occasionally assigned special projects. These special projects usually involved typing up reports for Astra Lloyd ("Lloyd"), a customer service supervisor. Lloyd testified that during any given week, special assignments generally involved only one employee who would spend approximately eight to twelve hours off the telephone. (Lloyd depo., pp. 50–51). CSRs also had to handle research in order to resolve issues that customers raised during phone calls. Each CSR generally handled their own research. If a CSR left work for the day before an issue had been resolved, the research would usually be assigned to the CSR's group leader. (Lloyd depo., pp. 52–53). Laura Amend–Blun, who was employed by Defendant and worked with Plaintiff in 1991 and 1992, stated that another task of CSRs was to key stacks of orders and other items into the computer system. (Amend–Blun affidavit, ¶ 8).

According to Lloyd, CSRs are required to be signed on the telephone system for eight hours and thirty minutes each day. The parties disagree as to whether the performance of CSRs is measured by the number of telephone calls they handle daily. Defendant contends that the performance of CSRs is not evaluated by the number of telephone calls they handle daily. Lloyd testified that the performance of CSRs is measured by their average talk time and their ratio of inbound versus outbound calls. Based on these statistics, Defendant would determine whether a CSR was handling the appropriate number of calls. (Lloyd depo., pp. 26–28).

Plaintiff, on the other hand, contends that she was evaluated at least in part by the number of telephone calls she handled daily. Plaintiff points out that Lloyd's memorandum to her dated March 17, 1992, specifically compared the number of calls handled by Plaintiff on certain days to the average number of calls handled by other CSRs. (Lloyd depo., Exhibit 2). Both parties agree that each CSR's telephone performance is also evaluated from time to time under the following criteria: use of routine call procedure, voice quality, etiquette, complaint handling, taking messages, completing call transfers, and handling promotion of company products.

In December 1990, Plaintiff was struck by a drunk driver and suffered a head injury. According to Plaintiff's former attorney, she "has suffered from continual panic attacks and driving phobia from the date of the accident to the present." (Letter of Hugh C. Wood, Esq. attached to Affidavit of Robert C. Daniel).

On January 13, 1992, a co-worker brought Plaintiff to Defendant's Health Services Department ("Health Services") because Plaintiff was suffering a "seizure." Connie Wilbanks, R.N. ("Nurse Wilbanks"), an occupational health nurse for Defendant, described Plaintiff as "very distressed [and] tearful." (Wilbanks depo., pp. 34–35 and Exhibit 1; Larkins depo., pp. 153–54). Plaintiff explained to Nurse Wilbanks that she had been in a motor vehicle accident, and that since the accident, she had had several episodes during which she felt as though she had "bee stings all over her body." Plaintiff said that she had been referred to a psychologist, who found that she had an anxiety disorder and prescribed Xanax and Prozac. (Wilbanks depo., pp. 34–35 and Exhibit 1; Larkins depo., pp. 153–54). Nurse Wilbanks recommended that Plaintiff see a neurologist and encouraged her to return to Health Services if she experienced any similar symptoms.

On January 30, 1992, a co-worker again brought Plaintiff to Health Services. Plaintiff saw Frances Childre, R.N., A.N.P. ("Nurse Childre"), the manager of Health Services. Plaintiff was crying and had suffered another attack. During this visit to Health Services, Plaintiff stated that during the attack she had been unable to speak and that her heart was "racing." (Wilbanks depo., p. 36 and Exhibit 1). Plaintiff informed Nurse Childre that her panic episodes seemed to be increasing. Nurse Childre advised Plaintiff to follow up with a psychiatrist and referred her to the Employee Assistance Program ("EAP"). Defendant made EAP therapy available to employees through an outside provider at no cost to employees. Plaintiff kept the appointment she made with EAP.

On February 17, 1992, Plaintiff went on short term disability leave because of "Chronic Pain Syndrome" and "Somatic Dysfunction." Plaintiff received short term disability benefits from Defendant. After Plaintiff's disability leave in mid-February 1992, Dr. G. Craig Heigerick, D.O., and neurologist Dr. David Lesch informed Defendant that Plaintiff was restricted to working mornings only.

Defendant accommodated the requests of Plaintiff's doctors, and Plaintiff began work on a half-time basis, four hours per day, on March 2, 1992. In addition to allowing Plaintiff to work half-days in March 1992, Defendant permitted her to have two 15–minute breaks during the morning instead of the usual one.

On March 4 and March 11, 1992, Plaintiff was permitted to miss work entirely because she had follow-up appointments with Dr. Lesch. Plaintiff requested and received full-day disability benefits for those days after Nurse Wilbanks checked with Plaintiff's doctor and learned that Plaintiff had seen the doctor and had x-rays on March 4, 1992, and had seen the doctor and underwent a MRI on March 11, 1992.

On March 12, 1992, Aly Cannon ("Cannon"), Defendant's manager of Customer Services, called Health Services regarding her concerns about Plaintiff's condition and inconsistencies in Plaintiff's behavior. Cannon told Health Services that, although Plaintiff had appeared very cheerful as she entered the building in the morning, she seemed abnormally lethargic at work. Plaintiff had told Cannon, "I'm barely here. I

could hardly get up and walk around." (Wilbanks depo., pp. 42–44 and Exhibit 1).

On March 13, 1992, Plaintiff came to Health Services explaining that she had just started taking a new medicine and indicating that she was light-headed and lethargic and that she needed to rest. The parties are in dispute as to whether the evidence indicates that Plaintiff actually took a rest on this day.

On three occasions during Plaintiff's part-time employment in early March, it was necessary for her supervisor to ask Plaintiff to leave after her half-day shift was over. Plaintiff had been staying at work five or six hours a day, in disobedience to her own doctor's instructions. These problems were reflected in a memorandum dated March 17, 1992, to Plaintiff from her supervisor, Lloyd. (Lloyd depo., pp. 9–10, 28–30, and Exhibit 2; Larkins depo., p. 149 and Exhibit 12).

Defendant contends that Plaintiff's performance during March 1992 was below the average for CSRs. According to Defendant, Plaintiff had logged less than 95% of her time handling telephone calls (the CSR average). Based on this performance, Defendant argues that Plaintiff was unable to perform adequately despite the fact that it allowed her to work half-days with an extra 15–minute break. (Lloyd depo., Exhibits 2 and 17; Larkins depo., p. 149 and Exhibit 12).

Plaintiff disputes that she was unable to perform adequately as a CSR and contends that although Defendant could have assigned her non-telephone duties, job restructuring was never considered by Defendant's management. (Cannon depo., pp. 42–43; Lloyd depo., p. 54). Plaintiff admits that her performance statistics on March 9, 10, 12, and 13, 1992, indicate that she handled less telephone calls than the average CSR but denies that the evidence shows that percentage of work time in which she had handled telephone calls was below the average of other representatives. Instead, Plaintiff states that the evidence shows that percentage of time handling telephone calls was below the expected work standards. (Lloyd depo., Exhibit II).

According to Defendant, on April 6, 1992, during a telephone conversation in which Nurse Wilbanks discussed with Plaintiff the lack of continued documentation from Dr. Lesch to support Plaintiff's disability, Plaintiff stated that she had attempted to commit suicide two weeks before and that she continued to have "seizures." (Wilbanks depo., pp. 58–59 and Exhibit 1). Plaintiff disputes that she told Nurse Wilbanks in a telephone conversation on April 6, 1992, that she had attempted to commit suicide two weeks before. Plaintiff states that she attempted to commit suicide twice: once on August 10, 1992, and once shortly thereafter during her hospital stay resulting from the first attempt. (Larkins depo., pp. 155–57 and Errata Sheet for p. 155; Larkins affidavit, ¶ 18).

On April 7, 1992, Plaintiff was hospitalized at Charter Peachford Hospital for, among other things, post-traumatic stress disorder. Between April 7 and April 24, 1992, Plaintiff was an inpatient at Charter Peachford Hospital and did not report to work. Plaintiff received full short-term disability benefits for this period in accordance with Defendant's short-term disability plan.

On April 24, 1994, Plaintiff discharged herself from the hospital against medical advice. Plaintiff testified that a very bad situation existed at the hospital, that she felt the doctor was not helping her, and that the doctor was just running up her bill. (Larkins depo., pp. 157–58). Plaintiff explained to Nurse Wilbanks that she was hospitalized because she had "disassociated from her body." (Wilbanks depo., pp. 61–62 and Exhibit 1).

Upon discharging herself from the hospital, Plaintiff selected a new psychiatrist, Dr. Eugene Crews. On April 29, 1992, Dr. Crews found that Plaintiff suffered from post-traumatic stress disorder, panic disorder, and major depression. Dr. Crews found that Plaintiff was totally disabled and unable to work. He could not predict when Plaintiff could return to work, even on a restricted basis.

In accordance with Dr. Crews' recommendation of April 29, 1992, Plaintiff took an extended leave from Defendant. Plaintiff continued to receive full short-term disability benefits throughout her leave period. Forms for claiming disability benefits were updated and submitted semi-monthly by Plaintiff and

Dr. Crews during this period. (Wilbanks depo., Exhibits 13–17).

On May 15, 1992, Bob Grant ("Grant"), a therapist on Dr. Crews' staff, informed Nurse Wilbanks of Health Services that Plaintiff continued to have panic attacks and that she needed intensive therapy to "get through each day and to cope with panic attacks instead of disassociating." Grant told Nurse Wilbanks that he questioned Plaintiff's motivation to change, but recommended a month of continued disability followed by a return to work on a half-day.

On May 29, 1992, Dr. Crews again reported to Defendant that Plaintiff's ability to return to work was "unknown." (Wilbanks depo., Exhibit 14; Crews depo., Exhibit 1). On June 10, 1992, Dr. Crews indicated that Plaintiff might be able to return to work in six to eight weeks. On June 25, 1992, Plaintiff called Nurse Wilbanks to report that she was ready to return to work. Nurse Wilbanks offered to set up a meeting between Plaintiff and her supervisors, and Plaintiff agreed. An updated report by Dr. Crews dated June 26, 1992, indicated that Plaintiff would be able to return to work on light or restricted duty on July 7, 1992. (Wilbanks depo., Exhibit 16).

On June 30, 1992, prior to her return to work, Plaintiff met with her supervisors, Lloyd and Cannon, and with Nurse Wilbanks. Plaintiff's illness and medications were discussed. Everyone agreed that Plaintiff would return to work on July 6, 1992. Plaintiff states that she was told that she would have some training to be reacclimated with work and that she would not be put on the phones until she was able to do so as agreed upon by all parties to the June 30, 1992 meeting. (Larkins affidavit, ¶ 15).

During this June 30, 1992 meeting, Lloyd and Cannon further agreed that Plaintiff would work half-days. Although CSRs were required to take only scheduled breaks, it was agreed that Plaintiff's breaks would be unscheduled to permit her to take breaks whenever she needed. Plaintiff was permitted to keep her doctor's appointments and was paid short-term disability benefits for time missed as a result of these appointments.

During the June 30, 1992 meeting, Plaintiff asked, and Defendant agreed, that Lloyd would permit co-workers specified by Plaintiff to be available to sit with her and read the Bible to her when she "needed" it. (Lloyd depo., pp. 42–43). Furthermore, it was agreed that during Plaintiff's first two weeks back at work, her performance statistics would not be monitored as usual.

Lloyd testified that after the meeting on June 30, 1992, she met with all of the Customer Service group leaders and supervisors to advise them that Plaintiff would be returning to work. In response to the employees' concerns, Lloyd also informed the employees of the persons Plaintiff wished to be contacted in the event she suffered a panic attack at work. Lloyd indicated that she made arrangements with the supervisors that, if the occasion should arise, the co-workers requested by Plaintiff would be available to read the Bible to Plaintiff. (Lloyd depo., pp. 36–38 and 42–43). Plaintiff does not dispute that Lloyd may have met with Plaintiff's supervisors and group leaders concerning her return to work. Plaintiff contends, however, that despite her request that her husband and doctor be contacted in the event she suffered a panic attack, Defendant failed to contact her husband as requested. (Larkins affidavit, ¶ 17; Dwight A. Larkins affidavit, ¶ 7).

On July 10, 1992, Health Services received a telephone call from one of Plaintiff's supervisors, who told Nurse Childre that Plaintiff was having an attack in the supervisor's office. When Nurse Childre arrived on the scene, Plaintiff was curled up in a chair, crying, and unable to speak coherently. Plaintiff was taken to Health Services by wheelchair, where she laid down for about twenty minutes and then left of her own accord. At the time of this panic attack, Plaintiff was on the telephone and indicated that she had gotten an internal warning signal but had ignored it because she was on the phone. (Wilbanks depo., p. 81 and Exhibit 1). Cannon informed Nurse Childre that this was Plaintiff's third such attack observed that week but the other two were not "full blown attacks." (*Id.*). Nurse Childre's notes

indicate that the July 10th attack was Plaintiff's only real panic attack that week and that the other two attacks referenced by Cannon were warnings which Plaintiff warded off with breathing exercises. (*Id.*).

Plaintiff failed to report to work on Monday, July 13, 1992. Nurse Wilbanks spoke with Plaintiff on the telephone, and Plaintiff told her that she had experienced a bad weekend and was exhausted, confused, and disoriented. Although Plaintiff reported to work on Tuesday, July 14, 1992, Nurse Childre reported that Plaintiff failed to respond to her supervisor when spoken to, as if the supervisor had not been there. Nurse Childre also reported that Plaintiff walked around with a teddy bear all day and left early thinking she had a doctor's appointment that afternoon. (Wilbanks depo., pp. 84 and Exhibit 1). Plaintiff does not recall bringing a teddy bear to work. (Larkins depo., p. 165).

On July 15, 1992, Plaintiff had an appointment with Dr. Crews. Plaintiff told Dr. Crews that she had passed out at work on the previous Monday and that at home she had been waking up during the night with panic attacks. Plaintiff also told Dr. Crews that she had been doubling and tripling prescription medicines to "get through the day." (Crews depo., p. 33).

On July 16, 1992, Plaintiff had a "crying episode" and was "trembling" at work. She came to Health Services "to lie down." (Wilbanks depo., p. 82). On July 17, 1992, Plaintiff was missing from her desk but was eventually found. Cannon brought Plaintiff to Health Services where she first rested and then took more medication and went home.

During the two weeks of July 6, 1992 and July 13, 1992, Plaintiff handled only 200 telephone calls. The company average was 150–200 calls per day. Nurse Wilbanks attempted to contact therapist Grant and Dr. Crews on July 24, 1992, to discuss Plaintiff's condition but was unable to reach them.

On Monday, July 27, 1992, the start of her third week at work, Plaintiff's co-workers found Plaintiff under a co-worker's desk crying. Plaintiff explained to Nurse Childre that when she "had to use her voice a lot,"

she "tended to do worse." Nurse Childre brought Plaintiff to Health Services to lie down, and Plaintiff slept there for two hours before going home. (Wilbanks depo., pp. 90–91 and Exhibit 1). During this incident, Nurse Childre told Plaintiff that perhaps customer service was not the area for her. (Wilbanks depo., p. 91 and Exhibit 1). Later in the day on July 27, 1992, Plaintiff called Defendant. Plaintiff was crying and wanted to talk to a co-worker on the telephone while the co-worker was still working.

Plaintiff returned to work on July 28, 1992, but was unable to answer any telephone calls. Although Plaintiff was not on the telephones that morning, she had another "attack" and was found on the floor in Lloyd's office. For a time, Plaintiff refused to leave the Customer Service area to go to Health Services. Defendant contends that Plaintiff could not identify any reason for the "attack." (Wilbanks depo., pp. 92–94 and Exhibit 1). Plaintiff contends that Defendant's insistence that she handle telephone calls on July 26 and July 27, 1992, even if she did not actually work on the telephone on July 28, 1992, was sufficient to trigger the July 28th attack. (Larkins affidavit, ¶ 17).

On July 28, 1992, Plaintiff's therapist, Grant, informed Nurse Childre by telephone that it was not "safe" for Plaintiff to be at work and that Plaintiff was unable to work due to her panic disorder. (Wilbanks depo., pp. 92–94 and Exhibit 1). July 28, 1992 was the last day Plaintiff reported to work. On July 29, 1992, Plaintiff's psychiatrist, Dr. Crews, reported to Defendant that it was unknown when Plaintiff would be able to return to work on either full duty or light or restricted duty. (Crews depo., pp. 46–47 and Exhibit 2).

Plaintiff was "hospitalized indefinitely" at Brawner Hospital on August 10, 1992, after attempting to commit suicide. Plaintiff was discharged from the hospital on August 14, 1992. On August 18, 1992, Dr. Crews again certified to Defendant that Plaintiff was unable to work full-time, part-time, or with light duty accommodations, and that it was still "unknown" when or if she could return. Dr. Crews stated that Plaintiff "will have to go on long term disability" and explained

that "she is still having panic attacks, mood swings, and disassociative episodes. We are working on medication changes, lifestyle changes, and relationships." (Crews depo., pp. 47–48 and Exhibit 2). On August 31, 1992, Dr. Crews confirmed Plaintiff's totally disabled status to Defendant. (*Id.*).

In March 1993, Dr. Crews again evaluated Plaintiff's ability to return to work. He indicated that Plaintiff was incapable of performing her job. He explained, "She cannot even leave her home every day nor function consistently there ... She is not able to work anywhere now." Dr. Crews further noted, "it is hoped that within a year that [Plaintiff] might be able to work at a low stress job." (Crews depo., p. 49 and Exhibit 4).

Plaintiff has not been able to work since she left Defendant in July 1992. Plaintiff does not know if she will ever be able to return to work. (Larkins depo., pp. 184–186). The parties agree that Plaintiff's current status can most accurately be termed "inactive." Defendant has never taken any action to terminate Plaintiff's employment. (*Id.* at 166–68). Plaintiff continues to receive long-term disability benefits from Defendant.

### ANALYSIS

The court will first address Plaintiff's motion for late filing of her response to Defendant's motion for summary judgment. Plaintiff requests the court to accept her response, which was filed one day after the deadline for filing a response expired, on the grounds of excusable neglect in accordance with Rule 6(b)(2) of the Federal Rules of Civil Procedure. Defendant has filed no response to Plaintiff's motion. Accordingly, Plaintiff's motion for late filing of her response is granted as unopposed. *See* Local Rule 220–1(b)(1) ("Failure to file a response shall indicate that there is no opposition to the motion.").

The next motions to address are Defendant's motions for leave to file a supplemental brief and a second supplemental brief in support of its motion for summary judgment. These motions are brought pursuant to Local Rule 220–1(b)(2), which provides that after the filing of a reply by the movant, "[n]o further briefs may be filed, except upon or-der of the court." Defendant's first supplemental brief filed on May 26, 1994, discusses two recent decisions under the ADA. Defendant's second supplemental brief filed on June 28, 1994, discusses a recent Eleventh Circuit decision on the Rehabilitation Act. Defendant argues that these recent decisions will assist the court in ruling on the issues presented in its motion for summary judgment.

Plaintiff has filed no opposition to Defendant's motion for leave to file its first supplemental brief. As of the date of this order, no response has been filed to Defendant's motion for leave to file a second supplemental brief, but the court notes that the time for responding to this second motion has not yet expired. Because the court finds that the additional cases will be helpful in light of the relatively few decisions that have addressed the ADA, Defendant's motions to file the supplemental briefs are granted.

■■■ The remaining motion to be addressed is Defendant's motion for summary judgment. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [Defendant] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on Defendant's motion, the court must view the evidence in a light most favorable to Plaintiff. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). To prevail in its motion for summary judgment, Defendant must show that the evidence is insufficient to establish an essential element of Plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If Defendant makes a sufficient showing, then Plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). If the evidence supporting Plaintiff's claims is insufficient for a jury to return a Plaintiff's verdict, or is merely colorable or

not significantly probative, then Defendant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If, however, reasonable minds could differ as to the import of the evidence, and a reasonable interpretation of the evidence could lead to a Plaintiff's verdict, then summary judgment is inappropriate. *Id.* at 251–52, 106 S.Ct. at 2511–12.

Plaintiff's ADA claims are based on Subchapter I of the ADA which governs discrimination in employment and became effective on July 26, 1992. *See* Section 108 Pub.L. 101–336. Defendant's first argument, therefore, is that it is entitled to summary judgment for all alleged discriminatory acts which occurred before July 26, 1992. Defendant maintains that Plaintiff may base her ADA claim only on Defendant's treatment of her after July 26, 1992. Defendant further points out that it is undisputed that Plaintiff's last day of active employment with Defendant occurred on July 28, 1992 and that Plaintiff has been totally disabled between July 29, 1992 and the date of this action. Consequently, Defendant argues that its liability to Plaintiff under the ADA, if any, must be determined exclusively with reference to the two-day period when she was present at work after the ADA's effective date, *i.e.,* July 27 and 28, 1992.

 In her brief in opposition to Defendant's motion for summary judgment, Plaintiff does not contest that the ADA only applies to conduct on or after July 26, 1992. Instead, Plaintiff asserts that:

occurrences before July 26, 1992 must be reviewed and considered in determining Defendant's knowledge of Plaintiff's disability and her need for accommodation, especially her need to be removed from the continual use of the telephone.

(Plaintiff's Brief, p. 10).

Courts that have addressed the issue have held that the ADA does not apply retroactively. *See O'Bryant v. City of Midland,* 9 F.3d 421, 422 (5th Cir.1993); *Verdon v. Consolidated Rail Corp.,* 828 F.Supp. 1129, 1140–41 (S.D.N.Y.1993); *Davis v. York Int'l, Inc.,* No. CIV.A. 92–3545–HAR, 1993 WL 524761 (D.Md. Nov. 22, 1993); *Morrison v. Detroit–Macomb Hosp. Corp.,* No. 92–CV–72340–DT, 1993 WL 316009 (E.D.Mich. Jan. 25, 1993). Accordingly, the court grants Defendant summary judgment on all acts occurring prior to July 26, 1992, the effective date of the ADA. The court will only consider Plaintiff's ADA claims to the extent that they are based on conduct subsequent to the ADA's effective date. *See Davis,* 1993 WL 524761, at *6–8. However, in determining whether that conduct is actionable, the court will evaluate that conduct within the framework of all of the evidence in the record.

The ADA prohibits covered employers from discriminating against "a qualified individual with a disability." 42 U.S.C. § 12112. Discrimination encompasses the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an undue hardship on its business. 42 U.S.C. § 12112(b)(5)(A).

In this case, Defendant does not dispute that Plaintiff has a disability within the meaning of the ADA.[1] In order to state a valid claim under the ADA, however, Plaintiff must also establish that she is a "qualified individual with a disability."

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description

---

1. Under the ADA, the term "disability" is defined as follows:

 (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

 (B) a record of such an impairment; or

 (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

The term "essential functions" is defined by the EEOC regulations as "the fundamental job duties of the employment position the individual with a disability holds" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Among other reasons, a job function may be considered essential because the reason the position exists is to perform that particular function; because of the limited number of employees available among whom the performance of that job function can be distributed; and/or because the function is highly specialized and the incumbent employee is hired for his or her expertise or ability to perform the particular function. 29 C.F.R. § 1630.-2(n)(2).[2]

Under the ADA, the term "reasonable accommodation" may include:

job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). The EEOC regulations further define the term reasonable accommodation to include:

Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.

29 C.F.R. § 1630.2(o)(ii).

▮ Defendant is not required to provide such an accommodation if it can demonstrate that the accommodation would impose an undue hardship on its business operations. 42 U.S.C. § 12112(b)(5)(A). Undue hardship, in turn, is defined as "an action requiring significant difficulty or expense, when considered in light of [certain] factors ..." 42 U.S.C. § 12111(10).[3]

In its motion for summary judgment, Defendant argues that Plaintiff is not a "qualified individual with a disability" within the ADA because she cannot perform the essential functions of the CSR position with or without reasonable accommodation. Specifically, Defendant argues that the evidence demonstrates that "Plaintiff could not perform two of the patently essential functions of her position: the ability to perform work and the ability to use the telephone to confer with customers." (Defendant's Brief, p. 33).

---

**2.** The EEOC regulations indicate that the following factors constitute evidence of whether a particular function is essential:
(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.
29 C.F.R. § 1630.2(n)(3).

**3.** The EEOC regulations outline the following factors to consider in assessing undue hardship:
(i) The nature and net cost of the accommodation ...;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;
(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;
(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and
(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.
29 C.F.R. § 1630.2(p)(2).

According to Defendant, the court "need not even reach the issue of whether [Defendant] offered Plaintiff a reasonable accommodation because Plaintiff cannot establish that she could perform the essential functions of her job, no matter what the accommodation her employer offered." (*Id.* at 33–34).

In support of its argument that Plaintiff cannot perform the essential function of attending her job and working, Defendant contends that both Plaintiff and her psychiatrist, Dr. Crews, agree that Plaintiff has been totally disabled from work since July 29, 1992. (*See* Larkins depo., pp. 185–186; Crews depo., Exhibit 2). Accordingly, Defendant argues that "[b]ecause Plaintiff is totally disabled from working, she cannot perform the essential functions of *any* job, let alone the functions of her CSR job at Ciba Vision." (Defendant's Brief, p. 35). Defendant argues that there is no accommodation that can be made for an employee who is entirely unable to work.

Moreover, Defendant maintains that even before Plaintiff became totally disabled, she had already proven herself unable to attend work on any kind of regular schedule. According to Defendant:

> Since February of 1992, Plaintiff either failed entirely to be present for work (and received disability benefits), or Ciba Vision has accommodated Plaintiff by permitting her to work a part-time schedule. Although Plaintiff was sporadically present at work on a part-time basis during the two and one-half weeks she worked in July 1992, she admits that she was permitted to leave her department during panic episodes on at least five different occasions, to come in to work late, and to leave early. Larkins Dep. at 162, 164–65. Plaintiff failed to show up for work at all on Monday, July 13, 1992, because the weekend had been too "stressful" for her. Wilbanks Dep. at 86–87. In short, Plaintiff's ability to be present at work during 1992 was entirely undependable.

(Defendant's Brief, p. 38). Defendant argues that "[e]ven with the accommodations given her by Ciba Vision, including allowing Plaintiff to work a half-day schedule and take off work time whenever she felt she needed to

do so, Plaintiff was not able to attend work with any regularity or predictability." (*Id.* at 39).

Defendant also argues that Plaintiff cannot perform the essential function of the CSR position that entails answering the telephones. According to Defendant, the sole reason the CSR position exists is to handle telephone calls and CSR's spend eight and one-half hours per day handling customer orders and complaints by telephone and maintaining appropriate documentation of the telephone calls received. (Lloyd depo., pp. 26–28). Defendant contends that Plaintiff was unable to perform these essential CSR duties despite the fact that Defendant made the following efforts to accommodate Plaintiff:

> Plaintiff was permitted to leave her work station and visit Health Services as needed, and Plaintiff took advantage of this accommodation on a regular basis;

> When Plaintiff visited Health Services, she was permitted to rest and/or leave work early if necessary;

> Plaintiff was referred to Ciba Vision's EAP for assistance;

> Plaintiff received disability benefits from Ciba Vision, both when she was out of work on disability leave (sixteen of twenty-six weeks between January and July of 1992) and when she was away from work for doctors' appointments;

> Plaintiff was permitted to work on a part-time basis as needed, and she took advantage of this accommodation during the ten weeks she was actually working during the period from February to July of 1992;

> Plaintiff was afforded an additional fifteen minute break during her half-day schedule;

> When Plaintiff returned to work from an extended leave in 1992, Plaintiff's supervisors met with her to coordinate her needs, and the Company permitted Plaintiff to work half-days, be absent for her doctors' appointments, take unscheduled breaks, and leave work early and come to work late, as her illness required;

> No performance standards were imposed on Plaintiff for the first two weeks of July

1992, immediately after she returned from short-term disability;

Plaintiff's manager arranged for employees to be available to read the Bible to Plaintiff upon her request; and

Plaintiff's co-workers and supervisors took time away from their own responsibilities to ask her how she felt, make her comfortable, and look for her and assist her during panic episodes.

(Defendant's Brief, pp. 45–46). Defendant contends that all of these efforts constitute reasonable accommodation of Plaintiff's stated disability.

In her response to Defendant's motion for summary judgment, Plaintiff argues that genuine issues of material fact exist which preclude summary judgment. In particular, Plaintiff argues that "a reasonable jury could determine that Defendant did not accommodate Plaintiff as required by the ADA by not restructuring the position to meet Plaintiff's needs, by not finding another position for Plaintiff, and by not asking Plaintiff what was needed to assist her." (Plaintiff's Brief, p. 7). Plaintiff argues that in order to reasonably accommodate her disability, Defendant should have restructured her job "to include primarily non-telephone duties" or should have "transferred her to another position in the company that did not include intense and continual telephone use." (*Id.* at 10). Plaintiff contends that what she "needed and repeatedly told management was to be taken off the telephones, and that is what Defendants failed to do." (*Id.* at 9).

Furthermore, Plaintiff contends that when she returned to work in July of 1992, she had reached an agreement with Defendant that she would not have to start using the telephones immediately. Plaintiff, however, maintains that Defendant failed to abide by the agreement or restructure her job responsibilities and assign her research, keying, and special project tasks in an effort to reduce her telephone time. Plaintiff contends that Defendant insisted that she handle telephone calls within several days of her return to work. Furthermore, Plaintiff contends that she was forced to take telephone calls over her insistence that she was not able to do so

on July 26 and July 27, 1992, after the ADA became effective.

■ Based on its review of the record, the court finds that Plaintiff is not a qualified individual within the meaning of the ADA because she is not able to perform the essential functions of the CSR position with or without reasonable accommodation. In particular, Plaintiff is not able to perform the essential function of handling telephone calls from customers.

The evidence establishes that handling telephone calls was an essential function of the CSR position held by Plaintiff. Lloyd testified that CSRs are required to be signed on the telephone system for eight hours and thirty minutes each day. (Lloyd depo., p. 26). Plaintiff concedes that talking on the telephone was a major part of her job. In her deposition, Plaintiff testified as follows:

Q. As to the taking of orders at the outset of your doing this job, did you think that was a big part of doing the job, taking the orders?

A. Of course it is a big part of taking the job.

Q. Did all or most of those orders come through telephone calls?

A. Yes.

Q. So your talking on the phone was a major part of your job as you began the job?

A. Yes, it was a major part of the job.

Q. Dealing with customer problems would also be a major part of the job?

A. Sure.

(Larkins depo., p. 97).

Despite acknowledging that talking on the phone was a major part of the job, Plaintiff contends that Defendant violated the ADA by failing to restructure her job to eliminate or reduce the amount of time she had to spend on the phone handling customer calls. Specifically, Plaintiff contends that Defendants have ignored 42 U.S.C. § 12111(9)(B), which defines "reasonable accommodation" to include "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position."

The ADA, however, does not require Defendant to eliminate an essential function of the CSR position to accommodate Plaintiff. The EEOC's interpretive guidance on the ADA specifically states that "an employer or other covered entity is not required to reallocate essential functions" of a job. Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R.App. § 1630.2. Courts that have addressed the issue have similarly found that reasonable accommodation does not require an employer to eliminate essential functions of the position. *See Bolton v. Scrivner, Inc.*, 836 F.Supp. 783, 788–89 n. 4 (W.D.Okl.1993) ("The ADA does not require employers to modify the actual duties of a job in order to make an accommodation for individuals who are not physically capable of performing them ... The statute still requires that an individual be able to 'perform the essential functions of the employment position ...' "); *Carozza v. Howard County*, 847 F.Supp. 365, 368 (D.Md.1994) (ADA does not require an employer to restructure job "to change its fundamental requirements, such as the ability to cope with its inherent stressors"); *Hall v. United States Postal Service*, 857 F.2d 1073, 1078 (6th Cir.1988) (under the Rehabilitation Act, an employer "is not required to accommodate a handicapped individual by *eliminating* one of the essential functions of the job ... In other words, an accommodation that eliminates an essential function of the job is not reasonable.").[4]

The United States District Court for the Northern District of Alabama recently addressed a case with facts somewhat similar to this case in *Johnston v. Morrison, Inc.*, 849 F.Supp. 777 (N.D.Ala.1994). The plaintiff in *Johnston* was employed in a restaurant as a food server. The plaintiff contended that she suffered from mitral valve prolapse, dysautonomia, panic attack disorder, and hypoglycemia. *Id.* at 777–78. As a food server, the plaintiff in *Johnston* was required to learn and communicate to consumers information concerning ingredients, portion sizes, and prices of the food offered by the restaurant. The plaintiff, however, testified that the constant changes in what she was required to learn caused her to suffer panic attacks. *Id.* at 778–79. In addition, the plaintiff testified that she could not handle her work when the restaurant became crowded. *Id.*

In an attempt to accommodate her disability, the restaurant assigned the plaintiff to the restaurant's least busy area and the fewest number of tables. Despite this accommodation, the plaintiff was still unable to handle her duties when the restaurant became crowded, and on one occasion when the restaurant became "packed", she suffered a "meltdown." *Id.* Based on these facts, the district court granted summary judgment in favor of the restaurant holding that:

> Since the plaintiff's disability plainly prevented her from performing the essential functions required of a food server at Morrison's L & N Seafood restaurant, with or without reasonable accommodation, the Court finds the plaintiff is not a qualified individual as that term is defined in the ADA and, for that reason, she cannot prevail on her ADA claim.

*Id.* at 778.

Similarly, Plaintiff in this case is unable to perform the essential function of handling customer telephone calls with or without reasonable accommodation.[5] The record indi-

---

**4.** Because of the similarity in the language of the Rehabilitation Act and the ADA, courts have relied on Rehabilitation Act decisions in interpreting the ADA. *See Bolton*, 836 F.Supp. at 787; *Johnston v. Morrison, Inc.*, 849 F.Supp. 777, 779 (N.D.Ala.1994). In addition, the legislative history of the ADA expressly notes that the definition of "qualified individual with a disability" is comparable to the definition used in regulations implementing section 501 and section 504 of the Rehabilitation Act of 1973." S.Rep. No. 116, 101st Cong., 1st Sess. (1989) at 26.

**5.** The court also finds merit in Defendant's argument that Plaintiff cannot perform the essential function of attending her job and working. Plaintiff admits that she has not been able to work since she left Defendant on July 28, 1992, which was only two days after the effective date of the ADA. In addition, the evidence reflects that prior to July 28, 1992, Plaintiff was absent or had to leave work on numerous occasions due to her disability. Numerous courts have held that regular attendance and the ability to perform work are an essential function of any position under the Rehabilitation Act. *See Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771 (8th Cir.1987), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988) (Rehabili-

cates that Defendant made numerous attempts to accommodate Plaintiff's disability including allowing her to work on a part-time basis pursuant to her doctor's request, providing her with additional breaks, arranging for employees to read the Bible to her when she requested, imposing no performance standards on her during the first two weeks of July 1992 when she returned from short-term disability leave, and permitting her to be absent for doctors' appointments.

Plaintiff has suggested no accommodations other than ones which would require Defendant to eliminate the essential function of handling customer telephone calls. Plaintiff argues that Defendant should have restructured her job to include primarily non-telephone duties. To support this argument, Plaintiff offers the affidavit of Laura Amend–Blun ("Amend–Blun"), a CSR who worked with Plaintiff in 1991 and 1992. Amend–Blun stated that:

> When I worked at Ciba Vision in 1992, the Customer Service section had stacks of orders and other items which needed to be keyed into the system. I was assigned to do such work when I had laryngitis. This is just one example of non-telephone work that existed in Customer Service.

(Amend–Blun affidavit, ¶ 8).

Plaintiff also cites the deposition testimony of Lloyd and Cannon to support her argument that her job could have been restructured to include primarily non-telephone duties. Lloyd, however, testified that although some CSR were assigned special projects such as typing up reports, these CSRs still handled customer telephone calls. Lloyd testified that on any given week, probably one CSR spent about eight to twelve

hours working on special projects involving non-telephone assignments. Lloyd also testified that each CSR handled their own customer research. (Lloyd depo., pp. 50–53). Cannon similarly testified that although some CSRs spend time performing non-telephone duties, there are no positions in customer service that were non-phone positions. (Cannon depo., pp. 39–42). According to Cannon, "Everybody is on the phone in customer service." (Cannon depo., p. 41).

The testimony cited by Plaintiff does not support her position that Defendant could have reasonably accommodated her disability by restructuring her job. Instead, the evidence reflects that answering telephone calls was an essential function of the CSR position which Defendant was not required to eliminate in order to accommodate Plaintiff.

Finally, Plaintiff contends that Defendant should have accommodated her by transferring her to another position within the company that did not include intense and continual telephone use. Under the ADA, the term reasonable accommodation may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). Plaintiff specifically contends that she applied for secretarial positions within the company for which she was qualified. (Larkins depo., pp. 169–171).

The court finds that Plaintiff has failed to present a genuine issue of material fact as to whether Defendant violated the ADA by failing to transfer her to another position within the company. First, Plaintiff admits that the secretarial positions for which she applied still involved answering the telephone, even if on a less frequent basis than the CSR position. (Larkins depo., pp. 173–74). Second, Plaintiff could not recall applying for any

---

tation Act does not protect employee who is no longer able to do his or her job due to physical and emotional ailments arising out of pressures of work); *Stevens v. Stubbs*, 576 F.Supp. 1409, 1415 (N.D.Ga.1983) (Rehabilitation Act "does not protect absenteeism or employees who take excessive leave and are unable to perform the prerequisites of their jobs").

In its recent decision in *Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir.1994), the Eleventh Circuit addressed the issue of whether an employee with frequent and unpredictable absences was a qualified handicapped individual under the Rehabilitation Act. In *Jackson*, the

Eleventh Circuit found that being present on a routine basis was an essential element of the plaintiff's job as a housekeeping aide for the Veterans Administration. The Court further found that because the plaintiff "was absent numerous times within the first few months of his probationary employment on a sporadic, unpredictable basis, he could not fulfill this essential function of his employment, that of being present on the job, and was not otherwise qualified." *Id.* at 279. Finally, the Court held that there was no way to accommodate the unpredictable nature of the plaintiff's absences without placing an undue hardship on the defendant. *Id.*

vacant positions after February 1992. (Larkins depo., p. 109). Thus, Plaintiff has not offered any evidence of vacant positions to which she could have been transferred subsequent to the effective date of the ADA. Finally, Plaintiff concedes that she has been totally disabled from work since July 28, 1992 (two days after the effective date of the ADA) and does not know if she will ever be able to return to work. (*See* Plaintiff's Response to Defendant's Statement of Material, Undisputed Facts, ¶ 59).

Accordingly, the court finds that Plaintiff is not a qualified individual under the ADA because she cannot perform the essential functions of the CSR position with or without reasonable accommodation. No genuine issues of material fact exist as to Plaintiff's ADA claim, and Defendant is entitled to summary judgment as a matter of law.

*CONCLUSION*

In sum, Defendant's motion for summary judgment [# 31–1] is GRANTED. Plaintiff's motion for late filing of her response to Defendant's motion for summary judgment [# 36–1] is GRANTED. Defendant's motion for leave to file a supplemental brief in support of its motion for summary judgment [# 45–1] is GRANTED. Defendant's motion for leave to file a second supplemental brief in support of its motion for summary judgment [# 46–1] is GRANTED.

SO ORDERED.