Cynthia SMITH, Plaintiff,

v.

**BLUE CROSS BLUE SHIELD OF KANSAS, INC., Defendant.**

**Civ. A. No. 94–4053–DES.**

United States District Court,
D. Kansas.

July 6, 1995.

James E. Benfer, Beth R. Foerster, McCullough, Wareheim & La Bunker, P.A., Topeka, KS, for plaintiff.

Betty J. Holt, Blue Cross Blue Shield of Kansas, Inc., Topeka, KS, Alan L. Rupe, Todd N. Tedesco, Rupe & Girard Law Offices, P.A., Wichita, KS, for defendant.

*MEMORANDUM AND ORDER*

SAFFELS, District Judge.

**I. INTRODUCTION**

This matter is before the court on defendant's Motion for Summary Judgment (Doc. 50). Plaintiff has filed a response (Doc. 63). Defendant filed a reply to plaintiff's response (Doc. 69).

This case arises out of plaintiff's claim that she was discriminated against in the terms and conditions of her employment and in the termination of her employment by defendant's violation of the provisions of the Americans with Disabilities Act.

The jurisdiction of the court is invoked pursuant to the provisions of 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 12101, the American with Disabilities Act of 1990.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff began employment with Blue Cross Blue Shield of Kansas, Inc. ("BCBSK") on June 27, 1988, as a Level III Informal Review Correspondent in the Medicare Division of BCBSK's Government Program Departments. Plaintiff was employed in this position until February 18, 1990, when she became a Level III Correspondent in the Medicare Secondary Payor Division in the same department.

On October 1, 1990, plaintiff moved to the *Coordination of Benefits* ("COB") *Inquiry* unit of BCBSK's Subscriber Services Department. Following training, plaintiff became a Level III COB Inquiry Correspondent on January 5, 1991. The function of a COB Inquiry Correspondent was to respond to telephone inquiries from BCBSK customers through an Automatic Call Distribution System ("ACD"). COB Correspondents were tied into the system through headsets at their desks. COB Correspondents take incoming calls and depending on the nature of the customer inquiry, may need to return calls at a later date. The job description states that COB Inquiry Correspondents are "physically tied to their work stations via telephone equipment."

Plaintiff has alleged that her job causes her stress because she does not like dealing with irate customers who have been denied benefits. Defendant notes that "employees receive verbal abuse from customers. The job is very stressful.... The job requires that we handle irate customers who are unhappy while maintaining a level of professionalism as expected by the company to project a good public image."

Plaintiff alleges that in December 1991, she requested a demotion to a less stressful job. Plaintiff says the request was denied.

In late January 1992, plaintiff presented her supervisor a letter from her primary care physician, Dr. Michael Laccheo ("Laccheo"). The letter stated that plaintiff was 20 weeks pregnant with an estimated delivery date of May 23, 1992. The letter indicated that the pregnancy was very stressful resulting in plaintiff being tearful, suffering headaches and insomnia. Dr. Laccheo stated that plaintiff found her work very stressful and that she was having a very difficult time talking over the phone. Dr. Laccheo inquired if plaintiff could be relieved of some telephone work and replace it with paperwork.

Although there is some dispute as to whether plaintiff received relief or the quantity of that relief there is evidence that some degree of relief was afforded plaintiff. In addition, by her own testimony, plaintiff acknowledges that even though she was no longer taking phone calls, she voluntarily answered the phones when things got busy.

On March 2, 1992, plaintiff presented another letter from Dr. Laccheo to her supervisor. The letter, except for the date and the information relating to the length of plaintiff's pregnancy, was identical to the one written in January.

Again, plaintiff was provided some relief and again voluntarily answered phones on her own.

In mid-March, plaintiff presented her supervisor with a physician statement which noted plaintiff was in good health and could continue to work until her expected delivery date of May 23, 1992. The letter also indicated plaintiff would be able to resume her work six weeks post partum. Dr. Laccheo asked that the telephone duty restrictions be continued noting that he preferred plaintiff be on the telephone no more than two hours/day. Plaintiff also submitted a request for maternity leave with and without pay for the six weeks after her delivery.

Plaintiff submitted two more physician statements relating to her request for maternity leave. The later was an immediate request for leave which would last approxi-

mately six weeks. Plaintiff began her maternity leave on May 22, 1992.

In late May, plaintiff submitted an application for the position of Level III Correspondent in the Medicare Division of BCBSK stating she would like to work for medicare again. Plaintiff interviewed for the position, but was not hired.

Plaintiff was released to return to work following her maternity leave on July 14, 1992. Plaintiff was released with no restrictions.

Plaintiff returned to work. In October while driving to an appointment with her social worker, Carol Bauman ("Bauman"), plaintiff suffered a panic attack. Plaintiff had never before experienced such an event. She saw her primary physician the next day and he suggested that she admit herself as an in-patient to the Parkview psychiatric facility.

Plaintiff and her husband spoke with someone at Parkview and were in the process of gathering plaintiff's belongings when plaintiff called Bauman to tell her of the plan. Bauman disagreed with the decision to enter Parkview and suggested that plaintiff go to Menningers instead. Bauman arranged for plaintiff to see Dr. William Johns at Menningers.

Plaintiff met with Dr. Johns the next day, described the panic attack, and told him she had been on the prescription medication Xanax. Dr. Johns believed it was possible that plaintiff was suffering from withdrawal from the Xanax.

On October 23, 1992, Dr. Johns faxed a letter to plaintiff's supervisor, Luanne Colhouer ("Colhouer"), regarding plaintiff's absence from work the previous day and noting plaintiff "appears to be having a withdrawal reaction as a result of the discontinuation of a prescription medication (Xanax) which she was given by a physician. The symptoms apparently began on October 20 and worsened on October 21 and 22. She is currently on a medication regimen. The purpose of which is to withdraw her from that medication over the next week."

Later in October, a Level II COB Clerk Expediter/Prescreener position became vacant. Plaintiff asked to be demoted to the position because it did not involve telephone contact with BCBSK customers.

Plaintiff claims she was not given the position so she had Bauman and Laccheo prepare correspondence recommending that she be allowed to take the position. Both parties prepared such letters in early November indicating plaintiff was under stress and recommending that plaintiff be placed in the Prescreener position.

Colhouer, COB Manager Anthony Tetuan, and Subscriber Services Department Director Don McClaflin discussed the position change and agreed to grant plaintiff's request for transfer to the Level II position. Plaintiff understood this was a demotion resulting in a cut in pay. Plaintiff began work in the new position on Monday, November 7, 1992.

On November 15, 1992, plaintiff suffered a panic attack at home. On Monday, November 16, 1992, plaintiff missed part of her work day so she could attend an appointment with her social worker. Bauman wrote a note to Colhouer stating that plaintiff had attended the appointment and that she was still suffering the on-going difficulty with her withdrawal from medication.

On November 17, 1992, plaintiff worked a full day in the Prescreener position, but claims she was distressed when Colhouer brought her Correspondent work to do. Plaintiff claims this brought on an immediate panic attack because she thought she was being asked to do telephone work. There is, however, no evidence that the work was at all connected to telephone contact.

Plaintiff left work and contacted Bauman. Arrangements were made for plaintiff to enter Menningers the next day. Plaintiff was admitted to Menningers on November 18, 1992.

Plaintiff was diagnosed with panic disorder, signs and symptoms of extreme anxiety and panic attack, difficulty from stopped medication and occupational difficulties. Plaintiff's admitting psychiatrist was Dr. Patricia Hoffman n/k/a Dr. Patricia Al–Adsani.

Plaintiff's treating psychiatrist was Dr. Elizabeth Hatcher.

Prior to December 1, 1992, plaintiff submitted a request for medical leave to BCBSK. Plaintiff's leave was approved as of November 18, 1992. Her request estimated the end date as: "Unknown at this time, after 1st of the year."

On December 1, 1992, Colhouer sent plaintiff a certified letter stating that there was not sufficient information ·to approve plaintiff's leave and asking that the information be forwarded as soon as possible. Plaintiff received the request on December 4, 1992.

BCBSK received a statement from Dr. Hoffman on December 4, 1992, which said "Please excuse Cindy from work from 11/18/92–12/18/92. The PT may require more time off. Because of extreme stress."

Plaintiff was discharged from Menningers on December 4, 1992. Her diagnoses upon discharge were Panic Disorder without agoraphobia and generalized anxiety disorder. Plaintiff was to continue as an out-patient and have her medications prescribed and monitored by Manageress.

On December 11, 1992, plaintiff requested a waiver of BCBSK's six month no transfer policy because she wanted to return to the Medicare division. McClaflin agreed to waive the policy and allowed plaintiff to seek other positions even though no Medicare division positions were available at the time.

On January 4, 1993, Bauman wrote BCBSK stating that plaintiff was still suffering from depression and anxiety and that Bauman was unable to predict when plaintiff might return to work.

At the time, BCBSK's Employee Handbook stated that if a leave of absence exceeds 45 days, the organization is relieved of any obligation to return an employee to the same position.

On January 11, 1993, plaintiff was informed that her position had been filled due to the length of the leave, 55 days, and the staffing requirements of the COB Inquiry Unit.

On January 18, 1993, plaintiff was informed by her treating psychiatrist that she would never release plaintiff to work at BCBSK. After January 1993, plaintiff applied for, and was granted, total disability benefits from Social Security. Plaintiff contended she had been totally disabled since November 17, 1992, and her benefits were retroactive to that date. Plaintiff also applied for, and was granted, total disability as of November 17, 1992, through BCBSK's long term disability plan. Finally, plaintiff requested and was granted a waiver of life insurance premiums due to her disability and again stated she became permanently disabled on November 17, 1992.

Near the end of May 1993, plaintiff received a letter from BCBSK notifying her she had been terminated because the documentation on file only released her from work until December 18, 1992.

Medical documentation in the spring of 1993 indicated plaintiff was unable to work, it was uncertain when she could work again and it was unclear what type of work she would be able to do.

As of November 8, 1994, plaintiff was still not released to return to any kind of work. In the pre-trial order, plaintiff stipulated to the fact that she has been unable to do any work since November 17, 1992.

Pursuant to the American With Disabilities Act ("ADA"), plaintiff initiated this action on April 4, 1994.

### III. SUMMARY JUDGMENT STANDARDS

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The substantive law identifies which issues are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is

such that a reasonable jury could find for the nonmovant. *Id.* Only genuine disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment. *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat. Laboratory,* 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the [nonmovant's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is some genuine issue for trial. Fed. R.Civ.P. 56(c). *See also Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting 56(e)).

Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

When examining a motion for summary judgment, the court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues").

"Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992). "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 929 (7th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2548.

Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. That is, the court decides whether there are any genuine factual issues that can be resolved only by a trier of fact because they reasonably may be resolved in favor of either party. *Id.*

## IV. DISCUSSION

■ As a preliminary matter, the court notes that the ADA became effective July 26, 1992. Any events prior to that date in plaintiff's case are irrelevant because the ADA does not apply retroactively. *Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572 (N.D.Ga.1994); *See O'Bryant v. City of Midland,* 9 F.3d 421, 422 (5th Cir.1993).

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

■ To state a prima facie case of disability discrimination on an employment termination claim, the plaintiff must show: (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, that is with or without reasonable accommodation, she is able to perform the essential functions of the job; and (3) that the employer terminated her because of her disability. *White v.*

*York Inter. Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995).

■ The court believes that plaintiff is not qualified within the meaning of the ADA and cannot establish a prima facie case for the following reason: she is unable to perform the essential functions of the job with or without accommodation and is, therefore, not qualified.

Our Tenth Circuit Court of Appeals has articulated a two-part test for determining whether a person is qualified under the ADA:

> "First we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions."

*Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995) quoting *White, supra*, 45 F.3d at 360.

The term "essential functions" is defined by the EEOC regulations as "the fundamental job duties of the employment position the individual with a disability holds" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential because the reason the position exists is to perform that particular function. 29 C.F.R. § 1630.2(n)(2).

There can be no question that plaintiff cannot perform the essential function of the job. Plaintiff's original job was one which required her to be physically tied to her workstation via the telephone. The job required her to deal with irate customers and to do so in a responsible and reasonable fashion. In sum, the job equals work on the telephone.

The court finds this is a prime example of a job function which is considered essential because the reason the position exists is to perform that particular function. *See* 29 C.F.R. § 1630.2(n)(2). Plaintiff's case is not unlike the plaintiff in the *Larkins* case.

In that case, plaintiff was a Customer Service Representative ("CSR") in defendant's company. Plaintiff was responsible for answering telephone calls from customers who wished to place orders or lodge complaints. *Larkins*, 858 F.Supp. at 1573. CSRs were required to be signed on the telephone system for eight hours and thirty minutes each day. The essential duties of the CSRs were to handle complaints and take orders. The CSR position existed solely to handle customer orders and complaints.

Plaintiff suffered an automobile accident, unrelated to her work and some two years later began experiencing panic attacks and an anxiety disorder. Plaintiff was prescribed medication, Xanax and Prozac and for a time was on the defendant's short-term disability plan. Defendant accommodated plaintiff's physician's requests for limited work hours with additional breaks. *Id.* at 1584.

Plaintiff's inability to do her job, even with extended breaks, resulted in her leaving work because it was "not safe for Plaintiff to be at work and she was unable to work due to her panic disorder." *Id.* at 1577. Plaintiff was declared totally disabled and continues to receive long-term disability benefits from defendant.

In *Larkins*, plaintiff admitted that telephone work was a major essential function of her job, but argued that defendant had violated the ADA by not restructuring the job to eliminate or reduce the telephone time. Plaintiff argued that defendant should have accommodated her disability and reduced her telephone time. Because it did not, plaintiff claimed she was entitled to relief under the ADA.

The *Larkins* court, however, found that the ADA "does not require Defendant to eliminate an essential function of the CSR position to accommodate Plaintiff. The EEOC's interpretive guidance on the ADA specifically states that 'an employer or other covered entity is not required to reallocate essential functions' of a job. Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R.App. § 1630.2" *Larkins*, 858 F.Supp. at 1583. Other courts have come to the same conclusion. *See Bol-*

*ton v. Scrivner, Inc.*, 836 F.Supp. 783, 788–89, n. 4 (W.D.Okl.1993), *aff'd* 36 F.3d 939 (10th Cir.1994) (Employer is not required to modify actual duties of a job in order to make an accommodation for individuals who are not capable of performing the essential functions of the job).

In *Johnston v. Morrison, Inc.*, 849 F.Supp. 777 (N.D.Ala.1994), plaintiff was employed as a food server in a restaurant. Plaintiff claimed to suffer from several conditions including panic attack disorder. As a server, she was required to learn, and communicate to customers, information about ingredients, portions and prices. Because the information was constantly changing and had to be relearned, the plaintiff was prone to suffer panic attacks. *Id.* at 778–79. In addition, plaintiff suffered attacks when the restaurant became crowded. *Id.* Defendant assigned the plaintiff to the least busy part of the restaurant but the problem was not alleviated.

The *Johnston* court granted defendant's motion for summary judgment holding:

> Since the plaintiff's disability plainly prevented her from performing the essential functions required of a food server at Morrison's L & N Seafood restaurant, with or without accommodation, the Court finds the plaintiff is not a qualified individual as that term is defined in the ADA and, for that reason, she cannot prevail on her ADA claim.

*Id.* at 778.

The court believes plaintiff, like the plaintiffs in *Larkins* and *Johnston*, is simply unable to establish a prima facie case that she is able to perform the essential functions of the job, with or without accommodation. Plaintiff is not a qualified individual within the meaning of the ADA because she is not able to perform the essential functions of the job with or without accommodation. Plaintiff was not able to perform the essential function of handling telephone calls from customers.

Having determined that plaintiff could not perform the essential function of the job, the court turns to the second part of the test articulated in *White.* The court must determine whether any reasonable accommodation by the employer would enable plaintiff to perform those functions.

■ As it relates to the essential and central telephone function of plaintiff's original job, the court finds no reasonable accommodation can be found. The sole and essential function of customer telephone inquiry positions, is telephone contact. An accommodation that eliminates an essential function of the job is not reasonable. *Hall v. United States Postal Service*, 857 F.2d 1073, 1078 (6th Cir.1988).

Because plaintiff has failed to prove an essential element of her prima facie case no genuine issue of material fact exists and defendant's motion for summary judgment must be granted.

■ As to plaintiff's contentions that defendant did not reasonably accommodate her, it is necessary that an individual be a qualified individual with a disability before a defendant has a duty to accommodate. *Bolton, supra*, 836 F.Supp. at 789, n. 4. Because the court has found plaintiff was not a qualified individual with a disability, the issue of reasonable accommodation is not relevant.

Plaintiff's other claims are likewise not relevant because of the court's finding that plaintiff was unable to perform the essential function of her job and, therefore, may not invoke the protections of the ADA.

■ The court notes that plaintiff raised an issue of exacerbation of emotional distress by defendant's action. To the extent that plaintiff was attempting to raise a claim of personal injury, plaintiff's remedy lies in tort or pursuant to the Worker's Compensation Act. *See Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 556, n. 6 (D.Kan.1995).

Plaintiff's claim that defendant could not to fill her position at the end of 55 days even though doing so was consistent with defendant's policy, is without merit. Likewise, plaintiff's claim that her job with the company should have been held indefinitely raises no issue for determination. By being totally disabled and unable to work, plaintiff cannot now claim to be a qualified individual with a disability because she could not perform the

essential functions of her position. *Id.* at 555.

Finally, the court notes that plaintiff concedes that she has been disabled from work since November 17, 1992, and that she does not know if she will ever be able to return to work.[1] It is a reasonable argument that no accommodation can be made for an employee who is entirely unable to work. *Larkins,* 858 F.Supp. at 1581.

The court finds that plaintiff is not a qualified individual under the ADA because she cannot perform the essential functions of the job with or without accommodation. No genuine issues of material fact exist as to plaintiff's ADA claim, and defendant is entitled to summary judgment as a matter of law.

**IT IS THEREFORE BY THE COURT ORDERED** that defendant's Motion for Summary Judgment (Doc. 50) is granted.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Partial Judgment on the Pleadings (Doc. 28) is denied as moot.

**IT IS FURTHER ORDERED** that plaintiff's Motion in Limine in Reference to Plaintiff's Past Drug Use (Doc. 29) is denied as moot.

**IT IS FURTHER ORDERED** that plaintiff's Motion in Limine to Prohibit Reference to Plaintiff's Application for and Receipt of Benefits under Social Security Disability or Defendant's Long-term Disability Policy (Doc. 30) is denied as moot.

**IT IS FURTHER ORDERED** that defendant's Motion to Amend Page 56 of Defendant's Memorandum in Support of Motion for Summary Judgment (Doc. 54) is granted.

**IT IS FURTHER ORDERED** that defendant's Motion in Limine to Exclude Certain Evidence at Trial (Doc. 73) is denied as moot.

---

[1] Plaintiff's claim that her expert stated she had the potential possibility in the past and the potential possibility in the future to work, is extremely speculative and does not rise to a level of a genuine issue of material fact.