UNITED STATES of America,
Plaintiff–Appellee,

v.

NEW YORK CITY TRANSIT
AUTHORITY, Defendant–
Appellant.

No. 879, Docket 95–6155.

United States Court of Appeals,
Second Circuit.

Argued Jan. 25, 1996.

Decided Oct. 8, 1996.

Louis E. Peraertz, Washington, DC (Deval L. Patrick, Assistant Attorney General, Dennis J. Dimsey, Department of Justice, Washington, DC, on the brief), for Plaintiff–Appellee.

Richard Schoolman, New York City (Barbara Berger, of counsel, Office of Martin B. Schnabel, New York City Transit Authority, Brooklyn, NY, on the brief), for Defendant–Appellant.

Robert E. Williams, Douglas S. McDowell, McGuiness & Williams, Washington, DC, filed a brief for Amicus Curiae The Equal Employment Advisory Council.

Before: JACOBS, LEVAL and PARKER, Circuit Judges.

JACOBS, Circuit Judge:

The New York City Transit Authority (the "Transit Authority") has an Equal Employment Opportunity Division (the "EEO Division") that handles employee discrimination complaints through informal settlement and mediation proceedings. However, under a policy that was in effect for about six years (ending in July 1993), the Transit Authority's Law Department had exclusive responsibility for handling an employee discrimination complaint if it involved an issue that was the subject of (1) litigation against the Transit Authority or (2) a charge filed with a city, state, or federal anti-discrimination agency. Accordingly, the EEO Division refused to accept any such complaint, and transferred any such ongoing internal complaint to the Transit Authority's Law Department whenever the issue became the subject of external litigation or administrative proceedings. Complaints lodged with the Law Department under that policy were thereafter handled, investigated, negotiated, settled, or litigated by the Law Department.

The United States Equal Employment Opportunity Commission (the "EEOC") became aware of the Transit Authority's policy, and took the position that it violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, because it amounted to retaliation against employees for asserting their Title VII rights. After futile negotiations in which the Transit Authority refused to sign a conciliation agreement or a consent decree, the Transit Authority unilaterally and formally changed its policy, and represented that it had no plans to reinstitute it. Five weeks later, the Department of Justice commenced this action in the United States District Court for the Eastern District of New York (Nickerson, *J.*).

The Transit Authority moved to dismiss the action as moot because the challenged policy had been discontinued. The district court denied that motion in *United States v. New York City Transit Auth.*, 846 F.Supp. 227, 229 (E.D.N.Y.1994). Later, after discovery, the district court granted summary judgment in favor of the United States, denied the Transit Authority's cross-motion for dismissal or summary judgment, and issued an injunction against the policy. 885 F.Supp. 442, 447 (E.D.N.Y.1995). A final judgment embodying the injunction was entered on May 15, 1995.[1]

On this appeal, we affirm the district court's denial of the Transit Authority's motion to dismiss this case as moot, but we vacate the injunction, reverse the grant of summary judgment, and direct the district court to enter summary judgment in favor of the Transit Authority on the ground that the policy challenged by the EEOC does not amount to retaliation.

## BACKGROUND

Under the Transit Authority's Internal Discrimination Complaint Procedure, an employee who wishes to complain about discrimination completes an intake questionnaire and is interviewed by an EEO Division investigator. After the interview, an investigator is assigned to look into the complaint. Within 120 days, a written "complaint determination" is issued by the assistant vice president of the EEO Division or an assignee. The written complaint determination may report any of the following: that evidence supports a reasonable belief that discrimination occurred; that the matter is settled to the complainant's satisfaction; that the complaint has been voluntarily withdrawn; or that the complaint was otherwise dismissed. A dissatisfied complainant has 30 days thereafter to appeal in writing to the vice president of the EEO Division, whose decision "shall be final on behalf of the Authority."

Until June 21, 1993, the Transit Authority's Internal Discrimination Complaint Pro-

---

1. Injunctive relief was the only relief potentially available after the United States abandoned any make-whole claims on behalf of individual vic-

tims. *See* 885 F.Supp. at 446 ("[T]he government does not seek any relief for, nor allege any identifiable harm to, any ... individuals.").

cedure provided that internal "[c]omplaints involving issues related to pending litigation or matters filed with a city, state or federal anti-discrimination administrative law enforcement agency are processed by the Law Department and not the Division of EEO." The Law Department thus had exclusive responsibility for handling complaints that were the subject of external proceedings, interviewing the people involved, gathering records, assessing defenses, deciding what evidence would be needed, developing litigation strategy (if any), and developing settlement strategies for cases that seemed amenable to settlement.

In October 1991, while investigating a discrimination claim filed by a Transit Authority employee, the EEOC determined that the Transit Authority's refusal to process the employee's internal complaint through the EEO Division violated the anti-retaliation provision of Title VII. The EEOC invited the Transit Authority to enter into a conciliation agreement that would eliminate the allegedly unlawful policy on an informal basis. In January 1992, the Transit Authority rejected the opportunity to enter into a conciliation agreement. The Justice Department then undertook an investigation which culminated in notice to the Transit Authority on April 2, 1993 that the EEO Division's "terminat[ion]" of internal discrimination complaints that are also the subject of complaints to federal, state, and city agencies is a pattern or practice of employment discrimination violative of Title VII. The Acting Assistant Attorney General of the Civil Rights Division advised the Transit Authority that the Attorney General has power to enforce compliance with Title VII in court, warned that "suit has been authorized against the Transit Authority," and invited the Transit Authority to enter into a consent decree. In May 1993, the Justice Department proffered a draft consent decree under which the Transit Authority would rescind and refrain from enforcing the challenged policy, and would change its written protocols to so reflect. (The draft also provided that the district court would retain jurisdiction for three years unless the United States sought an extension for good cause.)

On June 21, 1993, Transit Authority President Alan F. Kiepper signed a memorandum modifying the Internal Discrimination Complaint Procedure to provide that the EEO Division "will continue to process complaints ... even where a complaint has been filed with an outside agency (*e.g.*, State Division of Human Rights, federal [EEOC] etc.), or where a litigation has been commenced, so long as the complainant continues to cooperate with the [Internal Discrimination Complaint Procedure]." The stated purpose of the policy change was "to increase the effectiveness of the Authority's Internal Discrimination Complaint Procedure."

In a letter dated June 23, 1993, the Transit Authority rejected the proffered consent decree, made an unforthcoming counter offer, and explained why it would not surrender its freedom of action by executing a consent decree:

> It must be understood that the Transit Authority is seeking to implement a new procedure notwithstanding the absence of any dispositive case law concerning the contentions of the Justice Department. It is possible that issues such as conflicts of interest, confidentiality, attorney-client communications, etc. may arise during our implementation of the revised policy. Furthermore, should the retaliation issue be ultimately litigated and the courts find (correctly we believe) that the termination of an internal discrimination investigation upon the filing of an outside complaint does not constitute retaliation in violation of Title VII, the Transit Authority would not want to be precluded from again changing its policy. In the absence of meaningful prior experience with a methodology of allowing the continuation of our internal investigative process notwithstanding the filing of an external complaint or any meaningful case law suggesting the unlawfulness of our prior procedure, I would perceive our entry into a consent decree in a manner which would forever bind the hands of the Transit Authority on this issue as little short of irresponsible.

The United States commenced this action on July 27, 1993, alleging that the Transit Authority "has implemented ... a policy and

practice by which employees of the Transit Authority who file employment discrimination charges with federal, state or local fair employment practices agencies, including charges alleging acts that are unlawful under Title VII, are prohibited from pursuing complaints involving such allegations of discrimination with the Transit Authority's [EEO] Division"; and that the policy and practice "is intended to deny [its employees] the full exercise of [their] rights" under Title VII.

## DISCUSSION

### A. *Mootness.*

■ A ruling that a case is not moot is reviewed *de novo. Comer v. Cisneros,* 37 F.3d 775, 787 (2d Cir.1994). This case is not moot unless no reasonable expectation remains that the policy will be reinstituted. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953) (holding that voluntary cessation of a challenged action does not make a case moot unless the defendant can show that there is no reasonable expectation that the challenged action will be repeated). The district court found that the Transit Authority made an insufficient showing in that respect. We agree.

The Transit Authority, relying on *Tawwab v. Metz,* 554 F.2d 22, 24 (2d Cir.1977), argues that a change in policy embodied in the official document of a governmental entity demonstrates that there can be no reasonable likelihood that the wrong of the former policy will recur. The force of that principle is blunted here by a number of circumstances. First, for the reasons stated in the Transit Authority's June 23, 1993 letter rejecting the consent decree, the stated objective of the change of policy ("to increase the effectiveness of the Authority's" internal grievance program) may not be accomplished. That letter anticipates that the revised policy may create problems "such as conflicts of interest, confidentiality, attorney-client communica-

tions, etc." These reservations about the new policy foreshadow the eventual abandonment of the policy or the modification of it in ways that would present again the same issues between the same parties. We also think it is significant that the change of policy was instituted on the eve of the lawsuit. The Transit Authority emphasizes that the change had been under consideration long before the federal lawsuit, but that of course cuts two ways.

■ The Transit Authority also relies on *Armstrong v. Ward,* 529 F.2d 1132 (2d Cir. 1976), which dismissed as moot a complaint filed by female prison inmates at the Bedford Correctional Facility who were seeking an injunction against further transfers from Bedford to the prison at Fishkill. After the suit commenced, the State closed the women's unit of Fishkill prison. *Id.* at 1133. Although the State gave no assurance that the unit would stay closed, the State did represent that, if reopened, the conditions at Fishkill would be improved, and that in any event no inmate at Bedford would be transferred to Fishkill without her consent. *Id.* at 1134. We think that *Armstrong* is distinguishable, because the State's acts and undertakings in that case assured that, whether or not Fishkill reopened, and whether or not the improvements would gratify the plaintiffs, there was no reasonable likelihood that any Bedford inmate would be transferred there without her consent or that the conditions she would encounter there (adequate or not) would be the same conditions that the plaintiffs sought to litigate in the lawsuit. Here, the Transit Authority has listed reasons why the new policy may be unfeasible; indeed, the Transit Authority affirmatively contemplates returning to the challenged policy if favorable precedent is developed in similar cases litigated by other employers.[2] We are satisfied that the Transit Authority's change in its Internal Discrimination Complaint Procedure did not render this case moot.

---

2. The district court noted that its ruling regarding mootness was "consistent with the Transit Authority's refusal to enter into a consent decree." 846 F.Supp. at 228. We rely in part on specific statements that are contained in the Transit Authority's June 23, 1993 letter rejecting

the consent decree, and on reservations concerning future conduct contained in that letter, but we decline to attach significance to the mere refusal of political officials and appointees to bind future administrations of a governmental entity.

## B. *Retaliation.*

Title VII § 704 prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). We have held that a *prima facie* case of such retaliation "must show [1] participation in protected activity known to the defendant, [2] an employment action disadvantaging the person engaged in the protected activity, and [3] a causal connection between the protected activity and the adverse employment action." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991). As the district court observed, an employee's filing of a discrimination charge with external agencies is a "protected activity" that becomes known to the Transit Authority; and the Transit Authority admits the causal connection between the challenged policy and that protected activity. 885 F.Supp. at 445. Thus, "[t]he only question is whether the challenged policy embodies 'adverse employment action' within the meaning of Title VII." *Id.*

According to the Justice Department, the challenged practice here is an "adverse employment action because it deprived employees, who exercised their rights under Title VII, of an opportunity that was available to other employees." Appellee's Brief at 14. The particular opportunity or benefit is identified by the Justice Department as "having the EEO Division process a complaint through its internal complaint procedure." *Id.*

### 1. *Defensive Measures.*

■ Although it is true that the cases speak of employment actions that are "adverse" to the employee, it is important to remember that what the statute actually prohibits is *discrimination*. 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... under this subchapter.") At some level of generality, any action taken by an employer for the purpose of defending against the employee's charge can be characterized as adverse to the employee. Ordinary defensive measures are taken for the very purpose of defeating the employee's claim. Even mediation and settlement are steps that an employer takes to promote its ultimate self-interest. But it cannot be doubted that an employer may retain legal counsel to deal with discrimination claims and take other steps reasonably designed to prepare for and assist in the defense. An employer has latitude in deciding how to handle and respond to discrimination claims, notwithstanding the fact that different strategies and approaches in different cases and classes of cases will result in differences in treatment. Reasonable defensive measures do not violate the anti-retaliation provision of Title VII, even though such steps are adverse to the charging employee and result in differential treatment. The Transit Authority's policy is reasonable because it is a defensive measure otherwise available to the employer; and it is non-discriminatory because the difference in treatment between aggrieved employees who have exercised Title VII rights and those who have not is simply an effect of the employer's choice of defensive measures. We also note that the Transit Authority's defensive measures do not affect the complainant's work, working conditions, or compensation.

The logic of the EEOC's position would impair the ability of an employer to place its defense in the hands of counsel. Counsel would be unable to take the most basic precautions to defend against the claim. As this case demonstrates, an employer's control over the handling of claims against it serves several essential purposes that have nothing to do with retaliation, malice, or discrimination. The challenged policy allows the Transit Authority to defend itself more efficiently and effectively by localizing all decisionmaking and execution in the Law Department, and avoids parallel and duplicative proceedings in the EEO Division. The central administration of these efforts allows counsel to render effective advice, and to implement it by cautioning against gratuitous statements and the creation of unnecessary documents.

Also, use of counsel secures the attorney-client privilege, and may allow the invocation of the attorney work product doctrine to protect the fruits of investigation. Finally, the informal settlement procedures in the EEO Division would culminate in a finding that (if adverse to the employer) might prejudice the Transit Authority in any external proceedings. These considerations of efficiency and prudence have nothing to do with retaliatory animus or discrimination.

The claim against the Transit Authority is not that some or all of its employees have a contractual or other entitlement to internal claims-handling procedures of a particular kind. Rather, it is claimed that the commencement of litigation or of an administrative proceeding cannot trigger different defensive measures. Yet, it seems obvious that the commencement of litigation or administrative proceedings would galvanize the employer to seek legal counsel or otherwise to shift tactics. This phenomenon does not support an inference of retaliation. Legitimate and ordinary defensive interests furnish all the cause and effect needed to account for it.

Here, the Transit Authority had a policy of voluntarily processing discrimination claims through its EEO Division or through its Law Department, or both. That policy is at bottom a decision about how to handle claims lodged against it as an employer. The Transit Authority is free to choose to act in a benign and sympathetic way by satisfying grievances and settling disputes, or to proceed aggressively with litigation. That is a judgment that the employer makes in its own self-interest, whether enlightened or benighted.

## 2. Distinguishing Cases.

In concluding that the challenged policy is retaliatory, the district court relied primarily on *Johnson v. Palma*, 931 F.2d 203 (2d Cir. 1991). In that case, Johnson was first suspended and later fired for chronic lateness. *Id.* at 205. Johnson filed a grievance with his union, claiming that he had been treated unfairly by his employer. *Id.* Soon after

Johnson was fired, he filed a racial bias complaint with the New York State anti-discrimination agency. *Id.* The employer's policy was to discontinue the grievance proceeding if an employee filed a complaint with the state agency; citing this policy, the union refused to proceed with Johnson's grievance. *Id.* at 205–06. We concluded that, under Title VII § 704—which expressly forbids retaliatory adverse employment actions by *unions* as well as by employers, *see* 42 U.S.C. § 2000e–3(a)—the union's conduct in that case was enough to constitute an unlawful adverse employment action. *Id.* at 207. We further held that there was a sufficient causal nexus between the union's refusal to proceed and Johnson's state agency complaint to support a prima facie case of retaliation under Title VII. *Id.* at 208. The union argued that it had no retaliatory animus and had simply acquiesced in the employer's policy. *Id.* We disagreed because the union, by acquiescing in the employer's policy, had failed in its role as the employee's representative:

> In the usual case, an employee will seek the help of his or her representatives in resolving disputes between the employee and the employer. If an administrative agency charge is filed, it typically will be filed against the employer for engaging in a discriminatory practice. *A dispute with the union arises only after the employee becomes dissatisfied with the extent of representation by the union in the resolution of the dispute.*

*Id.* (emphasis added).

Thus, *Johnson* is concerned with the relationship between the union and the employee plaintiff, and holds that a union's abandonment of a grievance that the union has a contractual responsibility to pursue on the employee's behalf amounts to an adverse employment action. The Transit Authority, however, is not contractually bound to undertake or forgo any particular defensive initiatives, and is free under Title VII to decide for itself how it will address or resolve employee complaints of discrimination.[3]

---

**3.** Moreover, *Johnson* addresses "[a]n important concern" in the collective bargaining context which is not at issue here—that "the interests of

the individual employee may be subordinated to the collective interests of all employees in the bargaining unit." *Gilmer v. Interstate/Johnson*

Another case upon which the district court relied, *EEOC v. Board of Governors of State Colleges & Univs.*, 957 F.2d 424 (7th Cir.), *cert. denied*, 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992), *see* 885 F.Supp. at 446, is distinguishable on similar grounds. In *Board of Governors*, the complainant was a state university professor who had been denied tenure. *Id.* at 426. His union's collective bargaining agreement with the defendant Board of Governors provided for a specific grievance procedure leading to arbitration. *Id.* at 425–26. Article 17.2 of the collective bargaining agreement provided that this grievance procedure could be terminated when "an employee seeks resolution of the matter in any other forum." *Id.* at 426. When the professor filed an age discrimination complaint with the EEOC (pursuant to the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621–634), the Board of Governors invoked Article 17.2 and terminated the fully submitted arbitration of the tenure dispute. *Board of Governors*, 957 F.2d at 426.

The Seventh Circuit held that Article 17.2 violated the anti-retaliation provision of the ADEA. *Id.* at 431; *see also* 29 U.S.C. § 623(d). At one point, the court described the adverse employment action as the deprivation of "a contractual right to *an in-house grievance procedure*," 957 F.2d at 429 (emphasis added), but the holding is expressed later: "A collective bargaining agreement may not provide that grievances will proceed to arbitration only if the employee refrains from participating in protected activity under the ADEA." *Id.* at 431.

*Johnson* and *Board of Governors* are therefore distinguishable on the ground that the assertion of Title VII rights in those cases cost employees the right, contractually guaranteed in a collective bargaining agreement, to proceed against their employers in a binding arbitration that would control the outcome of an ultimate employment decision (firing and denial of tenure). Neither case bears upon the Transit Authority's voluntary, internal arrangements for investigating and mediating discrimination controversies.[4] Therefore, the district court's reliance on these cases was misplaced.[5]

### CONCLUSION

We affirm the district court's denial of the Transit Authority's motion to dismiss on the ground of mootness. We reverse the district court's grant of summary judgment in favor of the United States and direct that the district court enter summary judgment in favor of the Transit Authority.

---

*Lane Corp.*, 500 U.S. 20, 34, 111 S.Ct. 1647, 1656, 114 L.Ed.2d 26 (1991) (citation and internal quotations omitted).

**4.** The Transit Authority's written protocols for the Internal Discrimination Complaint Procedure provide that the outcome of the internal grievance procedure is "final on behalf of the Authority," but that "[i]n no instance will the final disposition of a complaint violate an employee's legal right to seek redress elsewhere."

**5.** The district court also cited to *United States EEOC v. General Motors Corp.*, 826 F.Supp. 1122, 1126 (N.D.Ill.1993), which rejected the reasoning we adopt today. The court in *General Motors*, however, relied entirely on *Board of Governors*. *See id.* As we have discussed, however, *Board of Governors* is not germane to this case. Nor are we persuaded by the district court's citation to *Owens v. New York City Hous. Auth.*, No. 84 Civ. 4932(CSH), 1994 WL 97411, at *2–3 (S.D.N.Y. Mar. 18, 1994), which relied solely on *Board of Governors* and *General Motors*.