**Maureen A. KLEM, Plaintiff,**

v.

**POPULAR FORD SALES, INC., and Brian Goodman, Defendants.**

**No. 95–CV–4436 (ERK).**

United States District Court, E.D. New York.

July 14, 1997.

Laurent S. Drogin, Law Offices of Ira Drogin, New York City, for Plaintiff.

Ralph C. Dawson, Fulbright & Jaworski, LLP, New York City, for Defendants.

## MEMORANDUM & ORDER

KORMAN, District Judge.

This is a disability discrimination case. Plaintiff Klem was a "Biller" and "Title Clerk" for Popular Ford Sales, Inc. from March 1992 through October 1994. She was responsible for, among other things, compiling license and registration material and forwarding it to Lipsco Ltd., a contractor Popular used to submit such material to the concerned Departments of Motor Vehicles. Errors and omissions in this paperwork sometimes caused Lipsco to return it to Popular for corrections, but Klem claims that she was not responsible for most of these problems. *See* Pl. Counterstatement ¶ 4.

Brian Goodman was Klem's supervisor at Popular. On several occasions prior to August 1994, he spoke to her about errors she made in entering data into a computer and counseled her at least once for being abrasive to a car salesman—although Klem contends that the salesman elicited such abrasiveness by first yelling and screaming at her. Goodman Aff. ¶ 5; Klem Aff. ¶¶ 2–6; Klem Dep. 65:6–16. At some point, whether before or after August 1994 is not clear, Goodman also told Klem that he would not continue to tolerate errors in the Lipsco paperwork. Klem Dep. 39:9–19; Goodman Aff. ¶¶ 4, 6.

In late August or early September 1994, Klem came down with a severe and unusually persistent headache that did not ultimately subside until January or February 1995.[1] Klem Dep. 17:14. Klem claims that her headache pain was "constant[,]" "[u]nbearable" and "[s]tabbing"—although it "was not a throbbing [pain] . . . just a constant pressure on the head," and thus was properly characterized "as more of a dull pain than a sharp pain[.]" Klem Dep. 16:23–17:14, 98:16–22, 99:21–25, 100:2–5. The headache affected her ability to concentrate and limited her ability to work as hard or as quickly as she had in the past. Klem Dep. 98:16–101:19; Klem Aff. ¶ 10.

While no conclusive diagnosis can be gleaned from the record, and although Klem cannot recall when the cause of her headache was first diagnosed (or even if a cause had been determined as of her termination date), a letter from a Dr. Bruining, dated October 25, 1994, suggests that Klem's headache likely was caused by persistent tension or perhaps chronic meningitis. Klem Aff. Exh. C p. 2. Apparently other diagnostic tests were necessary, however, as Klem took off work on Thursday, October 27 and Friday, October 28, so that she could visit her doctors for more testing, including an MRI examination.[2]

---

1. At some places the record indicates that Klem suffered from a single headache, and at other places it indicates that she suffered from multiple headaches. *See generally* Klem Dep. 14:5–17:25, 24:23–25:25, 28:2–25, 30:2–23, 38:2–11, 83:16–23, 98:14–102:20.

2. It is unclear from the record whether Goodman or others at Popular knew the specific rea-

Upon her return to work on Monday, October 31, 1994, Klem was terminated. At the time, Goodman allegedly remarked that Popular and Klem "would have to come to a parting of the ways[,]" because of her "current disability[,]" and because she "was not what [she] once was." Klem Aff. ¶ 13. Klem concedes, however, that she cannot recall the exact words that Goodman used, and Goodman claims that he did not mention Klem's headache at all. Id. ¶ 14; Goodman Aff. ¶ 4; Klem Dep. 83:18–23 (Goodman "said that we would have to [ (] and you will forgive me I don't remember his exact words [) ], but we would have to come to a parting of the ways because I was not what I once was[;] I just wasn't giving a[sic] 110 percent anymore since I had gotten my headaches."). Moreover, Klem has acknowledged that Goodman was generally fair in his dealings with her (at least until he fired her), and that she knew of no facts to suggest that he terminated her out of "malice," as that term is commonly used. Klem Dep. 63:25–64:4, 67:4–13.

Based on the foregoing allegations, Klem claims that her discharge violated the Americans with Disabilities Act of 1990 ("ADA" hereinafter), codified at 42 U.S.C. §§ 12101–12213 (1996). Specifically, although she does not allege that she was in fact disabled by her headache, she claims that she was discharged because defendants perceived that she suffered from a "disability." Klem also claims that in retaliation for filing an administrative complaint with the Equal Employment Opportunity Commission ("EEOC" hereinafter), she was given an adverse reference to a prospective employer and caused a "poison pen" letter to be created that disparaged her performance at Popular, entitling her to additional damages under the ADA's anti-retaliation provisions. Popular Ford Sales, Inc. and Brian Goodman, who are the named defendants, move for summary judgment on both the discharge and retaliation claims.

## DISCUSSION

### 1. The Discharge Claim

The ADA is a close cousin of both the Rehabilitation Act of 1973, 29 U.S.C. §§ 790–

son for Klem's absences on October 27 and 28,

794a (1996), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1996). See Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 542 (7th Cir.1995) ("[T]he employment provisions of the Act [ADA] merely generalize to the economy as a whole the duties, including that of reasonable accommodation, that the regulations under the Rehabilitation Act imposed on federal agencies and federal contractors."); Mohamed v. Marriott Internat'l, Inc., 905 F.Supp. 141, 154 (S.D.N.Y.1995) ("The new legislation [ADA] is also, however, based closely on Title VII[:] The employment title of the ADA adopts the powers, procedure, and remedies of parts of Title VII[;][m]uch of the wording of the two statutes is the same[;] [and][c]ourts in interpreting this provision have been quick to apply precedent set under Title VII.") (internal quotations and citations omitted). Thus, Rehabilitation Act and Title VII precedent is also controlling with respect to ADA claims.

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1996). A plaintiff has the burden of proving that she is a "qualified individual with a disability." See Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 383 (2d Cir.1996) (ADA and Rehabilitation Act case). Indeed, this is the first element of a plaintiff's prima facie case, the other two elements of which are that the plaintiff has suffered an adverse employment action, and that a causal connection exists between the adverse employment action and the disability. See id. at 383; Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir.1994) (Rehabilitation Act case).

### A. "Disabilities" Under the ADA

In order to establish the first element of her prima facie case—i.e., that she is a "qualified individual with a disability"—Klem must

1994.

show that her headache constituted a "disability", which the ADA defines as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being *regarded as* having such an impairment." 42 U.S.C. § 12102(2) (1996) (emphasis added).

By extending the ADA's protections to the last category of employees—i.e., those with "perceived" disabilities—Congress "intended to combat the effects of 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir. 1995); *accord School Board of Nassau Co. v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) (observing in a Rehabilitation Act case that, "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment.").

█ In this case, Klem does not claim that her headache was actually disabling. She claims only that defendants regarded her headache as a "disability." Under the ADA, whether an employee has such a "perceived disability" is determined in two stages:

> First, the Court must determine if the plaintiff is perceived to have a physical or mental impairment. Second, if so, the Court must determine whether the impairment is perceived to substantially limit one or more of that person's major life activities.

*Greenberg v. New York State,* 919 F.Supp. 637, 641–42 (E.D.N.Y.1996); *accord Wernick,* 91 F.3d at 383 (applying two-stage test to both ADA and Rehabilitation Act claims).

With respect to the first stage, the EEOC's implementing regulations define a "physical or mental impairment" as:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic

and lymphatic, skin, and endocrine; or (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (West 1997). Nonetheless, "the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment." *Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986) (Rehabilitation Act case).

At the second stage of the "disability" determination, an employee must demonstrate that his or her employer regarded the "impairment" as "substantially limiting" the performance of a "major life activity." An employee satisfies this requirement by showing that he or she:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*)(1) (West 1997).

"Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (West 1997); *see also* Interpretive Guidance, 29 C.F.R.App. § 1630.2(i) (West 1997) (list not exhaustive). One is "substantially limited" in the performance of a "major life activity" if he or she is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in

the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(West 1997). The following factors should also be considered in determining whether a plaintiff's limitations are "substantial": "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* at § 1630.2(j)(2).

Here, the only "major life activity" at issue is Klem's ability to work. *See* April 4, 1997 Hr'g Tr. at 6:14. In that regard, the EEOC's implementing regulations indicate that:

> (i) *The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.* (ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working": (A) The geographical area to which the individual has reasonable access; (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Id.* at § 1630.2(j)(3) (emphasis added).

Thus, to establish a "substantial limitation" with respect to the "major life activity" of work, Klem must come forward with evidence to show that regardless of her actual ability to work, defendants regarded her headache as "significantly restrict[ing]" her "ability to perform either a class of jobs or a broad range of jobs in various classes[.]"

### B. Klem's Headache Was Not a "Perceived Disability"

■ Klem has failed to come forward with sufficient competent evidence to meet her burden of showing that the defendants regarded her headache as "significantly restricting" her "ability to perform either a class of jobs or a broad range of jobs in various classes." Goodman, Klem's Supervisor, has stated that he "was not aware that Klem had any kind of disability, and Klem never indicated to me that she had any kind of serious headaches which affected her ability to function." Goodman Aff. ¶ 7. Nevertheless, accepting Klem's allegations as true, she has come forward with evidence to show that at least Goodman was aware of her headache prior to her termination, and that this affliction may have played some role in the decision to terminate her. This showing, however, is not sufficient to prevent a grant of summary judgment here.

■ "The mere knowledge of symptoms alone is *not* sufficient proof [to survive summary judgment] that an employer regarded an employee as disabled." *Alexandru v. Northeast Utils. Serv. Co.,* 1996 WL 684421, at *5 (D.Conn. Oct.10, 1996). Moreover, the fact that Klem was terminated from her particular job because of some physical ailment does not support an inference that defendants regarded her headache as disqualifying her from "either a class of jobs or a broad range of jobs in various classes." *See* 29 C.F.R. § 1630.2(j)(3)(i) (West 1997); *Heilweil,* 32 F.3d at 723 (observing that circuit courts have unanimously held that "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.")

Nor do Goodman's paraphrased discharge comments—"that I [Klem] was not what I once was[;] I just wasn't giving a 110 percent anymore since I had gotten my headaches"

(Klem Dep. 83:18–23)—offer any basis for inferring that Goodman or Popular perceived Klem's headache to restrict significantly her ability to perform "a class of jobs or range of jobs in various classes." At best, these comments suggest only that Goodman believed Klem's headache affected her ability to perform her particular job as well as she had in the past, and not that he perceived her headache as disqualifying her from a "class of jobs or a broad range of jobs in various classes." In this respect, Goodman's perception is confirmed by Klem's own description of the effects she perceived her headache to have had on her job: The pain was distracting, she had to work harder to focus, certain things took longer, and she tried to compensate in different ways. *See* Klem Dep. 99:5–7, 101:17–19. While Klem had difficulty concentrating and could not "work to her full potential" (Klem Aff. ¶ 10), she concedes that her headache's symptoms were merely "the regular physical things of a headache" (Klem Dep. 25:9–13, 100:14–22, 14:12–18). She also acknowledges that her headache did not affect her ability to walk, breathe, hear, care for herself, or learn, and it did not render her incapable of performing the essential functions of her job. Klem Dep. 14:19–15:19.

Thus, Klem's testimony plainly suggests that she and Goodman shared the same perception of her headache's negative effect on her work performance: she was not able to perform her duties as well as she had before the headache. There is simply no evidence here that could support an inference that defendants regarded her headache as "significantly restricting" her ability to perform either "a class of jobs or a broad range of jobs in various classes."

Moreover, Klem's "conjecture or surmise" about defendants' perceptions and motives for discharging her are also insufficient to create a genuine issue of material fact as to whether defendants regarded her headache as a "disability." *Goenaga v. March of Dimes Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (holding that a summary judgment motion cannot "be defeated merely on the basis of conjecture or surmise."); *accord Russell v. Acme–Evans Co.,* 51 F.3d 64, 70–71 (7th Cir.1995) (Posner, C.J.) (observing in

Title VII case that, with respect to evidence of discriminatory intent, plaintiff must come forward with something "other than what comes out of his own mouth" in order to resist properly supported motion for summary judgment).

Accordingly, because Klem has not come forward with evidence sufficient to support her claim that her headache was a "perceived disability," she has not established the first and most fundamental element of her prima facie case: membership in the protected class of employees with a "disability." Consequently, there is no need to address defendants' other arguments here—namely, that given the admittedly minor effect Klem's headache is alleged to have had on her ability to work and perform the other chores of daily living, her headache should be deemed a commonplace affliction that fails to rise to the level of an "impairment" under the ADA. *See Forrisi,* 794 F.2d at 934; *Stevens v. Stubbs,* 576 F.Supp. 1409, 1414 (N.D.Ga.1983) (Rehabilitation Act case holding that, "[w]hatever the precise delineations of the term 'impairment,' the court is unconvinced that it encompasses transitory illnesses which have no permanent effect on the person's health."). Although there are no doubt many persons who suffer disabling headaches over an extended period of time, there appears to be at the very least a serious question here as to whether Klem's headache is among those non-disabling maladies that were the object of the "myths and fears" (*Arline,* 480 U.S. at 284, 107 S.Ct. at 1129), or "archaic attitudes [and] erroneous perceptions" (*Wooten,* 58 F.3d at 385), that Congress sought to combat by including in the ADA the "regarded as" definition of "disability" (42 U.S.C. § 12102(1)(C)).

### 2. The Retaliation Claims

Klem's first retaliation claim concerns a putatively adverse employment reference defendants provided to a prospective employer. Specifically, Klem filed an administrative complaint with the EEOC on January 6, 1995 (Am.Compl.¶ 24), and subsequently, while looking for work in the spring of 1995, she alleges that Goodman "intentionally, knowingly and maliciously made various false,

misleading and negative statements about Klem in order to discourage . . . potential employers from hiring Klem" (*id.* at ¶ 38). While Klem has not introduced any evidence concerning what Goodman said to prospective employers and has no personal knowledge of his discussions with such employers (Klem Dep. 68:21 to 74:8), she infers retaliation from the fact that personnel officers (whose names she cannot recall) at two prospective employers, a Buick and a Ford dealership, allegedly told her that she "had the job" subject to verification of her employment with Popular, and that after contacting Popular, they declined to hire her (*id.*). Goodman disputes Klem's account, stating that he spoke with only one prospective employer, and that he told this employer that he had no comment respecting Klem's employment because of ongoing litigation of an unspecified nature. Goodman Aff. ¶ 8; Goodman Dep. 32:21–33:5. He testified at his deposition that he believed this was the best response to give, since "I felt that anything I said could be construed any which way, and I felt no answer was the best answer at that point." Goodman Dep. 33:15–17.

### A. ADA Retaliation Claims

■ The ADA's retaliation proscription, 42 U.S.C. § 12203 (1996), is nearly identical to the one found in Title VII, 42 U.S.C. § 2000e–3 (1996). The ADA proscription states that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). Thus, a prima facie case of retaliation is established by showing that: (1) plaintiff engaged in a protected activity; (2) plaintiff's former employer took employment action that was adverse to plaintiff; and (3) a causal connection exists between the protected activity and the adverse

action. *United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996) (Title VII case).

■ If an employee succeeds in establishing his or her prima facie case, the burden of production then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* If the employer meets its burden of production, the employee then bears the burden of establishing that the proffered reason for the action is a pretext for *discrimination*, "either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc).[3]

### B. Declining to Supply an Employment Reference

■ Klem arguably succeeds in establishing a prima facie case of retaliation with respect to Goodman's employment reference. She clearly engaged in a protected activity: filing a complaint with the EEOC. While she fails to come forward with any evidence to support her allegation that Goodman "intentionally, knowingly and maliciously made various false, misleading and negative statements about Klem in order to discourage . . . potential employers from hiring Klem" (Am. Compl. ¶ 38), Goodman concedes that he declined to discuss her employment with another car dealership, and this action is sufficiently "adverse" to satisfy the second element of Klem's prima facie case. *See Pantchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1055 (2d Cir.1978) (holding that a refusal to provide post-employment references, when motivated by retaliation for filing an EEOC action, could amount to actionable retaliation under Title VII). The third element of her prima facie case, a causal connection between the protected action and the adverse employment action, can be inferred from the fact that the retaliatory act here, the refusal to provide an employment reference, occurred shortly after Klem instituted EEOC proceedings. *See*

---

3. The word "discrimination" is used to articulate a retaliation claimant's burden of proof because the language of 42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate" against an employee "because" she engaged in a protected activity. *See New York City Transit Auth.,* 97 F.3d at 677.

*Dortz v. City of New York,* 904 F.Supp. 127 (1995) (observing that temporal proximity between employee's protected activity and employer's retaliatory act can be sufficient circumstantial evidence to support an inference that the latter was caused by the former).

Nonetheless, "[r]easonable defensive measures do not violate [an] anti-retaliation provision . . . even though such steps are adverse to the charging employee and result in differential treatment." *New York City Transit Auth.,* 97 F.3d at 677 (Title VII claim). Thus, in *New York City Transit Auth.,* the Second Circuit held that the City's policy of directly referring discrimination complainants to its law department, rather than first directing them to an internal EEO Division, was not discriminatory. *Id.* The differential treatment effectuated by this policy was explained as the consequence of a "reasonable defensive measure"—i.e., centralizing the City's authority to respond to discrimination suits—that would not support an inference of retaliatory motive. *Id.* In so holding, the Second Circuit offered the following observation:

> [I]t seems obvious that the commencement of litigation or administrative proceedings would galvanize the employer to seek legal counsel or otherwise to shift tactics. This phenomenon does not support an inference of retaliation. Legitimate and ordinary defensive interests furnish all the cause and effect needed to account for it.

*Id.* at 678.

Similarly, defendants here argue that their refusal to discuss Klem's employment during the pendency of EEOC proceedings was a "reasonable defensive measure." They adopted this policy to avoid subjecting themselves to a claim for retaliation and to avoid misleading prospective employers as to Klem's admittedly suboptimal performance at Popular. While an employer's state of mind in withholding a deserved positive reference would normally be a jury issue, the present case is plainly *not* one in which an employer's refusal to provide a positive reference supplies a basis for inferring retaliatory intent. *See Pantchenko,* 581 F.2d at 1055. Whatever perceptions defendants may have had concerning Klem's physical condition, the

record is undisputed that the quality of her work had declined. Klem Dep. 14:12–15:19, 25:9–13, 100:14–22, 101:7–10.

More particularly, the discharge remarks attributed to Goodman confirm that Klem was terminated because she "was not what [she] once was[;][she] just wasn't giving a 110 percent anymore[.]" Klem Dep. 83:18–23. Indeed, Klem's own affidavit and deposition concede that prior to her discharge, her headache "made it difficult for [her] to concentrate or to work at [her] full potential." Klem Aff. ¶ 10; Klem Dep. 98:16–101:19. Because of the distracting headache pain, Klem had to work harder to focus, certain tasks took more time, and she attempted to compensate in different ways. Klem Dep. 99:5–7, 101:17–19. Yet, if defendants had spoken frankly to inquiring prospective employers about these problems, even without alluding to the fact that Klem was fired, then they could have opened themselves up to a claim for retaliation. *See Pantchenko v. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978) (suggesting that adverse letters of reference could be actionable retaliation).

Under these circumstances, there is compelling support for defendant's explanation of why it declined to comment, and insufficient evidence to suggest that this response was merely a pretext for discrimination. *Fisher,* 114 F.3d at 1338–39. On the contrary, defendants' decision not to comment on Klem's employment arguably benefitted her, because information was withheld that was not favorable to Klem and that would have "besmirched h[er] reputation." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997).

This can hardly be deemed to constitute *discrimination* against an employee because she filed an administrative complaint with the EEOC. Indeed, to make employers bear the costs of a trial in these circumstances would, to borrow a phrase from Fifth Amendment jurisprudence, force upon them a cruel trilemma. *See, e.g., Pennsylvania v. Muniz,* 496 U.S. 582, 596, 110 S.Ct. 2638, 2647–48, 110 L.Ed.2d 528 (1990). If an employer is candid with other employers, it may have to defend against a claim that it spoke falsely; if the employer remains silent, it

may have to defend against a claim that it withheld a positive reference; and if it provides an unmerited, positive reference, it becomes a party to a fraud.

If only this third option offers employers a "safe harbor" from litigation, then they will resort to the kind of dissembling references that Klem's attorney advises is appropriate in case such as this one: "I'd say give a[s] glowing [a] reference as you're comfortable with because it's going to permit your former employee to obtain new employment and therefore it's going to limit any potential for a back pay award claim." April 4, 1997 Hr'g Tr. at 45:9–13. While the law should be applied to discourage retaliation, it should not be applied to turn employers into liars. Nor should it be applied in a way that encourages employers to refuse to supply references for any of their past or present employees. Such a policy would undoubtedly defeat a retaliation claim, but it would also punish those employees whose performance truly merits a positive reference, and it would leave prospective employers without a way to reliably assess competing applicants.

These considerations inform my decision to grant defendant's summary judgment motion here. Nevertheless, what is dispositive here is Klem's failure to come forward with evidence upon which a jury could find that defendants chose not to comment on plaintiff's employment to retaliate "for plaintiff's efforts to protect herself by filing charges with the EEOC" (*Wanamaker*, 108 F.3d at 466), rather than to reasonably defend themselves in light of "the commencement of litigation or administrative proceedings" (*New York City Transit Auth.*, 97 F.3d at 678). Moreover, Klem's failure to substantiate her self-serving allegations with affidavits or depositions from prospective employers raises a serious question as to whether she has come forward with sufficient evidence to establish that anything defendants said to the employers adversely affected her employment prospects. *See Nelson v. Upsala College,* 51 F.3d 383 (3rd Cir.1995), *infra.*

### C. The "Poison Pen Letter"

■ Klem's second retaliation claim alleges that defendants pressured Lipsco's president to write a negative letter respecting Klem's job performance at Popular. Klem Aff. ¶¶ 8–9. This undated letter indicates that Klem made numerous errors that required approximately 25% of the registration packets she forwarded to be returned. Klem Aff. Exh. A at 2. It recounts that after Klem was terminated, Lipsco personnel were called in to go over uncompleted work, whereupon they discovered that Klem had not complied with certain record-keeping requirements, and that she had simply tossed into her drawer some paperwork that had been returned for corrections. *Id.* at 3. Klem also alleges that in a telephone conversation prior to his deposition, Fox, Lipsco's president, disclosed that he did not want to write this letter, but he feared he would lose Popular's business if he did not. *Id.* In his deposition, however, Fox denies that he ever had such a conversation with Klem. Fox Dep. 84:4–22.

Defendants correctly argue that this claim is legally insufficient. Klem has failed to come forward with any evidence to suggest that Fox's "poison pen" letter was ever published or provided to her current employer or prospective employers. *Accord Wanamaker,* 108 F.3d at 466 (holding that plaintiff's "conclusory, unsupported claims[,]" that the putatively retaliatory act "had an injurious effect on his reputation in the legal community[,]" was insufficient to state a retaliation claim). Nor is there any other evidence from which a jury could infer that the letter affected Klem's current or future employment relationships. This is fatal to Klem's claim, because in order to establish a prima facie case of retaliation, she must come forward evidence of an "adverse *employment* action." *See Nelson v. Upsala College,* 51 F.3d 383, 387 (3d Cir.1995) (observing that "post employment conduct, to give rise to a retaliation complaint, must relate to an employment relationship."). As the *Nelson* Court held, to the extent a plaintiff has a remedy as a result of a post-termination action that is adverse, but that does not affect an employment relationship, that remedy is found in the applicable common law of torts, not in federal civil rights laws. *Id.* at 388. Accordingly, because Klem has not come forward with any

evidence from which a jury could find an "adverse employment action", this retaliation claim must also be dismissed.[4]

## CONCLUSION

Defendants' motion for summary judgment as to plaintiff's ADA discrimination and retaliation claims is granted. I decline to exercise supplemental jurisdiction over plaintiff's remaining state and local claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (" [I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Plaintiff's complaint is therefore dismissed with prejudice.

**SO ORDERED.**

---

**4.** There are two other alleged defects that need not be addressed here. First, there is a serious question here as to whether defendants can be deemed responsible for this letter. Second, the letter is undated and its contents do not, contrary to plaintiff's contentions, establish whether it was written before or after EEOC proceedings were commenced, creating a question as to whether the letter can be deemed retaliatory.